No. 39,424

THE STATE OF KANSAS, ex rel. HAROLD R. FATZER, Attorney General of the State of Kansas, *Plaintiff*, v. THE BOARD OF REGENTS OF THE STATE OF KANSAS; WALTER S. FEES, Chairman, MRS. ELIZABETH HAUGHEY, A. W. HERSHBERGER, WILLIS N. KELLEY, LESTER MC-COY, DREW MCLAUGHLIN, GROVER POOLE, DR. L. B. SPAKE, OSCAR S. STAUFFER, Members, and HUBERT BRIGHTON, Secretary, *Defendants.*

(269 P. 2d 425)

Opinion filed April 10, 1954.

*Dean G. Ostrum,* assistant attorney general, argued the cause, and *Harold R. Fatzer,* attorney general, was with him on the briefs for the plaintiff.

*A. W. Hershberger,* of Wichita, argued the cause and was on the briefs *pro se* and as attorney for the defendants.

The opinion of the court was delivered by

SMITH, J.: This is an original action in quo warranto on the relation of the attorney general to oust the board of regents from carrying out the provisions of its resolution authorizing The Kansas State College of Agriculture and Applied Science to use the proceeds from oil and gas leases covering real estate in Morton county, granted the state under an act of congress dated July 2, 1862, entitled "AN ACT donating public lands to the several states and territories which may provide colleges for the benefit of agriculture and mechanic arts" in the construction and equipping of dormitories for students attending that college. The petition also asked an adjudication as to the proper disposition and use of proceeds from such lands, that is, cash bonuses, delay rentals and royalties. The petition was filed, an answer was filed and the action has been submitted to us for final judgment since there is no dispute as to the facts.

The petition described 4,000 acres of land in Morton county and alleged it was part of the public lands certified to the state of Kansas under the provisions of the above act for the benefit of Kansas State Agricultural College (now Kansas State College of Agriculture and Applied Science).

Reference was made to the act of congress and there was an allegation that the mineral rights in these lands were still held by the state for the benefit of the college; that in accordance with G. S. 1949, 76-164, et seq., the board of regents on June 8, 1953, executed nine oil and gas leases on these lands and received a cash bonus therefor of $342,012.80; that in accordance with G. S. 1949, 76-168, on November 20, 1953, the board adopted rules and regulations covering the disposition of proceeds from these lands; that on November 20, 1953, the board by resolution approved the use of the proceeds, including cash bonuses, delay rentals and royalties, from these lands in the construction and equipping of dormitories for students attending the college; that in passing this resolution the defendant board purported to be acting in accordance with the act of con-

gress of July 2, 1862, and G. S. 1949, 76-410, and would unless ousted from exercising such powers use said proceeds for the erection and equipping of dormitories; that the $342,012.80 cash bonus and all prospective delay rentals and royalties thereunder constituted moneys derived from the sale of lands, as that term was used in the federal act, and should be paid into the state treasury and credited to the "Agricultural College Permanent Fund"; and under the second condition of the grant no portion of such proceeds could be applied directly or indirectly under any pretense whatever to the purchase, erection, preservation, or repair of any building or buildings.

The petition then stated that an actual controversy existed between the plaintiff and defendants as to the interpretation of the federal act and G. S. 1949, 76-410, upon which the court should make a binding adjudication under its declaratory judgment powers; the questions involved were set out in the petition as follows:

"1. Does a cash bonus received upon the execution of said oil and gas leases on said lands constitute 'moneys derived from the sale of lands' as that term is used in said land grant and thus have to be credited to the 'Agriculture College Permanent Fund'?

"2. Do delay rentals received under said oil and gas leases on said lands constitute 'moneys derived from the sale of lands' as that term is used in said land grant and thus have to be credited to the 'Agriculture College Permanent Fund'?

"3. Do royalties received under said oil and gas leases on said lands constitute 'moneys derived from the sale of lands' as that term is used in said land grant and thus have to be credited to the 'Agriculture College Permanent Fund'?

"4. In the event any one of the preceding questions is answered in the negative, is said college prohibited by the second condition in said land grant from using any of such proceeds (cash bonus, delay rentals, or royalties) for the construction and equipping of dormitories for students attending said college?"

The prayer of the petition was that this court oust the board of regents from carrying out the provisions of the resolution referred to and make a binding adjudication of the above questions.

Attached to this petition was a copy of the oil and gas lease. It was the ordinary form 88 lease. Also, attached was a copy of the rules and regulations adopted by the board of regents and providing how proceeds from those leases should be handled. It required that these should be deposited and kept by the state treasurer in a separate fund for the use and benefit of Kansas State College of Agriculture and Applied Science and also that moneys derived

from the sale of such lands should be paid into the state treasury and credited to the "Agriculture College Permanent Fund." Also, attached was a copy of the minutes of the board of regents whereby the college was authorized to use all the proceeds, including cash bonuses, delay rentals and royalties in the construction and equipping of dormitories for students attending Kansas State College.

The answer admitted the factual allegations of the petition and that an actual controversy existed between the parties and asserted the negative of each of the questions which have been stated heretofore in this opinion.

The answer further stated that congress by enacting the statute referred to provided for the donation to the several states of lands then considered to be "agricultural lands" since congress excluded from the operation of that statute "all mineral lands" and intended that the agricultural lands so donated should be sold for development by farmers and that all moneys from such sales should be used, as set out in the statute.

The answer further stated that the state acquired title in the lands for the benefit of the college in fee simple absolute by selection in accordance with the above cited statute; (a copy of the records of the auditor was attached to the answer) that the lands were selected as agricultural lands; and the fact that these lands were later found to contain valuable deposits of minerals did not invalidate the original conveyance since there was no fraud or collusion in the selection of the lands and since the validity of the title could be attacked on that ground only by the United States, which had made no such claim.

The answer further stated that pursuant to Chapter 443 of the 1951 Session Laws of Kansas the board of regents on September 17, 1951, adopted a resolution by which it exchanged the lands described in the petition for other agricultural lands owned by the United States substantially equal in value for agricultural purposes; that the conveyances by which this exchange was accomplished, each reserved to the prior owner the entire mineral rights in each of the tracts respectively.

A summary of the appraisal, a copy of the resolution of the board of regents and a copy of each conveyance were attached to the answer.

The answer then alleged that since the state still owned agricultural lands conveyed to it by the United States substantially equal in value for agricultural purposes to the lands described, the execu-

tion of the oil and gas leases was not the "sale of lands" and the bonuses, delay rentals and royalties from these leases were not "moneys derived from the sale of lands" as described or contemplated by the act of congress.

The prayer of the answer was that the relief requested by the plaintiff be denied and that the court answer the questions stated in the petition in the negative.

The affidavit of the auditor attached to the answer referred to the act in question and certain acts of the legislature of Kansas and stated that pursuant to that act the state through its agents selected the land in question. The certificate of the general land office was also attached and stated that all lands in the State of Kansas shall be subject to the disposal as agricultural lands.

The affidavit of the auditor further stated that according to the books, records and papers now on file in the office of the state auditor the state was the owner in fee simple of the property in question.

Exhibit No. 2 attached to the answer was the record of the appraisers appointed to appraise the 7,000 acres in question and stated that the land in question was valued at $4,895 and the federal land to be exchanged therefor was valued at a total value of $4,880.

Exhibit No. 3 attached to the answer was the resolution of the board of regents empowering the chairman and secretary of the board to execute papers necessary to consummate the exchange.

Exhibit No. 4 was the patent signed by the governor for the land in question to the United States.

Exhibit No. 5 was the deed signed by the chief of the soil conservation service conveying to the board of regents the 640 acres in question. The deed and the patent each reserved all mineral rights.

Attached to the abstract and brief of plaintiff as an appendix was the Federal Act of July 2, 1862, entitled "An Act donating public lands to the several states and territories which may provide colleges for the benefit of agriculture and mechanic arts."

The first section of this act granted to the several states 30,000 acres for each senator and representative in congress, to which each state should be entitled on that date, and provided that no mineral lands should be selected or purchased under the provisions of the act. (The effect of this section was, since Kansas then had two senators and one congressman to allot to the State of Kansas 90,000 acres of land.)

The second section provided how the land should be selected and for what price the state should sell it and for the issuance of scrip to states in which there was no public lands.

The third section provided that all expenses of management, superintendence and taxes from the date of the selection of the lands should be paid by the states out of the treasury of the states "so that the entire proceeds of the sale of said lands shall be applied without any diminution whatever. . . ."

The fourth section provided how the moneys derived from the sale of the lands should be invested, that is, in stocks in the United States or some other safe stocks and that the moneys so invested "shall constitute a perpetual fund, the capital of which shall remain forever undiminished (except so far as may be provided in section fifth of this Act), and the interest of which shall be inviolably appropriated, by each state which may take and claim the benefit of this Act, to the endowment, support and maintenance of at least one college where the leading object shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and mechanic arts, in such manner as the Legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life."

The fifth section provided—

First, if any portion of the funds invested should be lost, it should be replaced by the state to which it belongs, so that the capital of the fund should remain forever undiminished; and

Second, no portion of said fund, nor the interest thereon, shall be applied, directly or indirectly, under any pretense whatever, to the purchase, erection, preservation or repair of any building or buildings; and

Third, that any state which accepted the provisions of the act should provide at least one college, or the grant should cease, and the state would be bound to pay the United States the amount received of any lands sold; and

Fourth, annual reports should be made regarding the progress of each college to the secretary of the interior; and

Fifth, a provision regarding the price of the land selected; and

Sixth, that no state while in a condition of rebellion should be entitled to the benefit of the act; and

Seventh, no state should be entitled to the benefits of the act unless it should express its acceptance thereof by its legislature within two years from the date of its approval by the president.

The remaining three sections are not important to us here.

Attached also as Appendix "B" in the brief and abstract was an amendment to the above act. It enlarged somewhat the type of securities in which the proceeds of the sale of the land in question could be invested.

Since there is no dispute about the actual facts, the action was submitted on the pleadings as to whether a judgment should be entered declaring the defendant board has no authority to use the proceeds from oil leases on the land in question for the construction and equipping of dormitories for the use of students attending Kansas State College of Agriculture and Applied Science. Or stated as it is in the petition, Do the three different categories of proceeds, that is, cash bonuses, delay rentals and royalties have to be deposited in the Agriculture College Permanent Fund? A corollary question is—If the foregoing questions should be answered in the negative, then is the college prohibited by the second subparagraph of section 5 of the federal act from using any of these funds for the erection and equipping of dormitories for the use of students attending the college?

A statement in narrative form will be helpful. The act donating public lands to the several states and territories which may provide colleges for the benefit of agriculture and the mechanic arts approved July 2, 1862, granted to the several states and territories for the endowment, support and maintenance of at least one college to teach such studies as were related to agriculture and mechanic arts, 30,000 acres of land for each senator and representative in congress, to which it should be entitled. Kansas had two senators and one congressman at that time, so it was granted 90,000 acres of land by this act. For some reason, not clear, the entire 90,000 acres was not certified to Kansas in 1862. All the land that was certified at that time has long since been sold. In 1908 the Sixtieth Congress, by section 3, 35 United States Statutes at Large, page 465, provided that there should be certified to the state of Kansas 7,682 acres of public land, in full satisfaction of the state's claim under the act of 1862. By this time about all the public land in the state was in the extreme western portion of the state. The land with which this case is concerned was a part of this and was located in Morton

county. We note from the letter of the General Land Office that the act of congress, approved May 5, 1876 (19 Stats 52) provided that all lands in the state of Kansas should be subject to disposal as agricultural lands and these selections were supported by the usual non-mineral and non-saline affidavits and the lands selected were not returned by the surveyor general as mineral. All this took place in 1910 following the act of 1908, to which reference has already been made.

Now to return to 1862, the federal act provided that no state should be entitled to its benefits unless it should express its acceptance thereof by its legislature, within two years of its approval by the president. Accordingly our legislature in 1863 enacted chapters 2, 3 and 4 of the Session Laws for that year. Chapter 2 accepted the provisions of the act of congress and obligated the state to abide by its terms. Chapter 3 referred to the act and the acceptance thereof and chapter 4 provided for the government and operation of the college. Section 16 of chapter 4 provided as follows:

"The ninety thousand acres of land granted to the State of Kansas by Congress, to endow a college for the benefit of agriculture and the mechanic arts, shall be used solely for the endowment of said Kansas State Agricultural College of the State of Kansas, and for no other purpose whatever; and the interest on the fund arising from the sale of said lands shall be used exclusively for the salaries of the president, professors and teachers of this college; but the principal, or the moneys arising from the sale of said lands, shall be invested according to law, and be a fund to remain forever undiminished."

This act was amended by chapter 13, section 1 of the Laws of 1871, but only to permit the interest from the fund to be used for other purposes than paying the salaries mentioned in the former act.

Following these acts and in compliance therewith, there was created by the proper authorities what is still referred to as the "Agriculture College Permanent Fund." Almost at once some of the land was sold and the proceeds of these sales were paid into this fund, the interest from it being used in maintaining the agricultural college at Manhattan, in accordance with the terms of the above acts, ever since.

We all know about the comparatively recent oil and gas activity in southwest Kansas. It has given an enhanced value to this land, comparatively low in value up to that time.

Our legislature at the session of 1951 enacted chapter 443. The title of the act refers to certain lands owned by the Kansas State

College of Agriculture and Applied Science and to certain other lands owned by the United States and being administered under Title III of the Bankhead-Jones Farm Tenant Act. The act then authorized the board of regents to exchange certain land owned by it, describing the land in question here, for lands owned by the United States. The act provided that there should be an appraisal by a board consisting of one appraiser, to be appointed by the United States, one to be appointed by the state board of regents and the third to be selected by those two; that the appraisement should be on the basis of the mineral rights in each tract to be reserved by the respective parties and that the exchange should not be made unless the land to be exchanged by the United States should be at least 95% in appraised value to the land in question in exchange therefor by the college.

The exchange spoken of in the petition and the answer of defendants was made pursuant to this act. The surface rights in the 4,000 acres, with which we are concerned, were valued at $4,895 by the appraisers, and the surface rights in the federal land of 640 acres were appraised at $4,880.

Through this transaction the state now owns the mineral rights in 4,000 acres and the surface in 640 acres—hence it owns about the same value in surface as it did when it owned the 4,000 acres outright.

We turn now to the act of the legislature for 1943, pursuant to which these leases were made. Chapter 268 of that session laws gave in section 1 authority to the board of regents to lease any of its lands for oil and gas or other minerals. Subsequent sections provided for advertising of the intention to lease and for sealed bids and that the leases should be made to the highest responsible bidder.

G. S. 1949, 76-168, being chapter 268, section 5 of the Laws of 1943, provided that all proceeds of such leases should be paid into the state treasury and kept in "separate funds" for use and benefit of proper institutions under rules and regulations adopted by the board of regents, approved by the attorney general, and filed with the revisor of statutes, as provided by law. Pursuant to this chapter, the leases we are considering were made. When the leases were made, the lessee paid the board $342,012.80. The rule of the board of regents was adopted providing that the proceeds of these leases should be deposited and kept by the state treasurer in a "separate fund for the use and benefit of Kansas State College of Agriculture

and Applied Science." This rule also provided that all moneys from the sale of such lands should be paid into the state treasury and be credited to the "Agriculture College Permanent Fund." This is the first time a "fund for the use and benefit of Kansas State College" was established, as distinguished from the "Agriculture College Permanent Fund." The former is the title of the fund in which the $342,012.80 bonus money was placed and is now carried. The board of regents referred to this fund in its Exhibit "K," which provided that all cash bonuses, delay rentals and royalties received from the oil and gas leases in question should be used for the construction and equipping of dormitories for students attending Kansas State College.

Actually this action is brought by all state officials interested so they may be sure the use they propose to make of this bonus money is not unlawful.

It should be remarked here, the only money in the fund now comes from the cash bonus paid to the board of regents at the time the leases were entered into. There are no royalties or delay rentals in that fund at this time. This amount is many times the value of the entire surface rights in the 4,000 acres.

The state argues as a reason why the board of regents should be ousted from using such money for the erection and equipping of dormitories and the question as to the other categories of proceeds should be answered in the affirmative is the act of 1862 provides in the first place that all moneys derived from the sale of any of the lands given the state by that act should be invested in stocks and the interest inviolably appropriated to the endowment, support and maintenance of at least one college and the second subparagraph of section 5 of the act provides no portion of the fund, nor the interest thereon should be applied directly or indirectly under any pretense whatever to the purchase, erection or repair of any building. The state argues the act means what it says and it was the intention of congress that this fund should remain forever inviolate and undiminished for the purpose of support and maintenance of the college, and that there should never be any diminution whatever of the proceeds from the sale of this land for those purposes. A considerable part of the brief of the state is devoted to historical considerations, from which it argues what must have been the intention of congress when it enacted the act of 1862.

We do not find on examination the considerations that surrounded

the enactment of this law almost 100 years ago to be so helpful as it might seem at first glance. For one thing, it is clear congress thought it was granting to the state purely agricultural land for purposes of agriculture and agriculture only. The department of the interior was meticulous in being sure that no land marked as mineral lands by the Surveyor General should be selected. As a matter of fact, as late as the time when we received this identical land in 1910, the federal government was still meticulous in making sure we did not receive any mineral land. It was only by fortuitous circumstance as the history of our state revealed itself that oil and gas were discovered in that part of Kansas as a part of the great Midcontinent Oil and Gas Field.

Another point which prevents us from attaching as much significance to the historical considerations is that obviously by the language used it was the intention of congress that this land should be sold and the proceeds put into a fund. The act provides how this fund shall be invested and subparagraph 2 of section 5 speaks of no portion of "the fund" nor the "interest thereon" and provides such shall not be applied to the erection of buildings. Obviously this fund is the fund that is obtained from the sale of lands for agricultural purposes.

The state has owned this particular land in Morton county since 1910, or forty-four years. It has not been able to sell it during that time as agricultural land. The act by which this exchange was made and the one authorizing the leasing of it for oil and gas were merely acts of good business on the part of the state. From that businesslike administration of this land has arisen the fund with which we are dealing here. It is no distortion of facts to say the entire situation is one that was never dreamed of by the members of the senate, whose debate is attached to plaintiff's brief as a guide in interpreting this statute. What we have is that the state has received in the form of this bonus money many times what the 4,000-acre tract was worth as agricultural land and still owns the same value in surface rights.

This subsequent discovery of oil and gas could not have any effect on the grant to the state. (See *Crum, et al., v. Oil Co.*, 117 Kan. 54, 230 Pac. 299; also *Burke v. Southern Pacific R. R. Co.*, 234 U. S. 669, 34 S. Ct. 907, 58 L. Ed. 1527 [1914]; *Southern Development Co. v. Enderson*, 200 Fed. 272 [D. C. Nev., 1912.])

Under such circumstances, it is proper for us to examine the

language of the federal act. When we do that, we find the entire question turns upon whether the making of the leases and the acceptance of the bonus money should be held to be a sale of land as referred to in section 4 of the act of 1862. Once we have answered that question with reference to a cash bonus, we shall consider it with reference to royalties and delay rentals.

It is well settled that there are three types of income that arise from an oil and gas lease.

The term "cash bonus" has in the oil business a well-settled meaning. It is money paid by the lessee to the lessor in consideration of the execution of an oil and gas lease, as distinguished from royalty which under the form 88 lease, as we have here, is the one-eighth of all oil and gas produced to be paid lessor. (See *Geller v. Smith*, 130 Cal. App. 485, 20 P. 2d 102.) It is usually paid by the lessee to the lessor as consideration for a lease in territory more or less desirable as a drilling project.

The term "delay rentals" is used to describe the rental the lessee agrees to pay the lessor after the initial term of the lease has expired and no wells have been drilled. In this case the lessee agrees if no well has been commenced by June 8, 1954, to pay the lessor one dollar per acre a year, which will operate as a rental and cover the privilege of deferring the commencement of operations for drilling for a year.

As remarked already, "royalty" as used in an oil and gas lease means under this lease the one-eighth of any oil and gas produced.

An oil and gas lease has certain features peculiar to it. It conveys no interest in the land, but is merely a license to explore. (See *Burden v. Gypsy Oil Co.*, 141 Kan. 147, 40 P. 2d 463; also *Dickey v. Brick Co.*, 69 Kan. 106, 76 Pac. 398; *Gas Co. v. Neosho County*, 75 Kan. 335, 89 Pac. 750; and *Beardsley v. Gas Co.*, 78 Kan. 571, 96 Pac. 859.)

Such a lease is a *"profit a prendre."* The lessee may use it or refrain therefrom. (See *Brinkman v. Empire Gas and Fuel Co.*, 120 Kan. 602, 245 Pac. 107; also *Hardcastle v. McCluskey*, 139 Kan. 757, 33 P. 2d 127.)

It is well settled that oil and gas in place constitute real estate. (See *In re Estate of Randolph*, 175 Kan. 685, 266 P. 2d 315.) It is equally well settled that an oil and gas lease even when there is production does not operate to sever the oil and gas from the surface. (See *Hover v. McNeill*, 102 Kan. 492, 175 Pac. 150.)

The giving of these oil and gas leases did not constitute the sale of lands as the term is used in section 4 of the act of 1862. The board of regents sold nothing. This conclusion is fortified by the fact that congress in 1862 was considering the land in question from an agricultural standpoint.

The only thing with which it parted was the right it gave the lessee to explore for gas and oil. As far as the $342,012.80 cash bonus is concerned, if the lessee does not care to or considers it good business not to it need never drill any wells on this land.

It is true the act of 1862 provides the fund from the sale of lands shall "remain undiminished." We have demonstrated these leases did not constitute a sale of lands. Furthermore, the fund from the sale of lands, if we consider the land a part of the fund, is undiminished by this transaction. By means of the trade with the department of agriculture, the state still owns as much in value for agricultural purposes as it did before. The actual situation is that nearly 100 years after the passage of the act of 1862 the state found itself with 4,000 acres of land from which it was receiving very little income and for which there was no ready market.

What has been said with reference to the cash bonus applies with equal force to the delay rentals. This does not constitute money derived from the sale of land.

The same may not be said of the royalties to be paid if oil or gas is found. This does represent something of value that is taken from the land. The oil and gas in place is real estate and when it is taken out the value thereof is reduced by so much. Consequently the royalty money if and when any is paid will constitute moneys derived from the sale of land. It belongs in the "Agriculture College Permanent Fund" and may not be used for the erection and equipping of dormitories.

What has been said answers the query of the state as to the second paragraph of section 5 of the act of 1862. Since the moneys received as a cash bonus and for delay rentals need not be placed in the "Agriculture Permanent Fund" the provisions of this subparagraph do not prevent the money in these two categories being used in the erecting and equipping of dormitories.

Question No. 1 "Does a cash bonus received upon the execution of said oil and gas leases on said lands constitute 'moneys derived from the sale of lands' as that term is used in said land grant and thus have to be credited to the 'Agriculture College Permanent

Fund'?" is answered in the negative. Question No. 2 "Do delay rentals received under said oil and gas leases on said lands constitute 'moneys derived from the sale of lands' as that term is used in said land grant and thus have to be credited to the 'Agriculture College Permanent Fund'?" is answered in the negative. Question No. 3 "Do royalties received under said oil and gas leases on said lands constitute 'moneys derived from the sale of lands' as that term is used in said land grant and thus have to be credited to the 'Agriculture College Permanent Fund'?" is answered in the affirmative. Question No. 4 "In the event any one of the preceding questions is answered in the negative, is said college prohibited by the second condition in said land grant from using any of such proceeds (cash bonus, delay rentals, or royalties) for the construction and equipping of dormitories for students attending said college?" is answered as to questions 1 and 2 in the negative and as to question 3 in the affirmative.

Judgment will be for plaintiff in part and for defendants in part, in accordance with this opinion.

THIELE and WEDELL, JJ., concur in the result.