No. 51,440

SIDWELL OIL & GAS CO., INC., *Appellee,* v. JOHN H. LOYD, *Appellant,* v. FORBES, *et al., Third Party Defendants.*

(630 P.2d 1107)

Opinion filed July 17, 1981.

*Jack E. Dalton,* of Dodge City, argued the cause and was on the brief for the appellant.

*Larry D. Tittel,* of Smyth & Tittel, of Ness City, argued the cause and was on the brief for the appellee.

*Basil C. Marhofer,* of Ness City, was on the brief for the third party defendants.

The opinion of the court was delivered by

FROMME, J.: Sidwell Oil & Gas Co., Inc. brings this action to cancel an oil and gas lease held by John H. Loyd and to quiet its title to an oil and gas lease held on the NE/4 of Section 33, Township 16 south, Range 26, west of the 6th P.M. in Ness County, Kansas. After a trial to the court, the court held there was no meeting of the minds as to material terms when the lease was executed. The Loyd lease was cancelled and Sidwell's title to its oil and gas lease was quieted. In order to restore the parties to their original positions it was ordered that Loyd have judgment against Sidwell under the Occupying Claimant's Act for improvements to the leased premises in the sum of $9,872.42. Loyd was also given judgment against the owners of the land for the bonus originally paid for the execution of the void lease. Loyd appeals to this court.

The Loyd lease was negotiated through P. W. Lundy, the agent for the owners of the real estate. He had looked after this real estate for the Miner heirs for many years. In late 1974, or early 1975, Loyd called Lundy on the telephone to inquire about obtaining an oil and gas lease on the property. According to Lundy, the lease was to be for a period of three years and as long thereafter as oil or gas was being produced. A two dollar per acre bonus or $320.00 was to be paid on execution and delivery of the lease. An annual delay rental of one dollar per acre was to be paid thereafter.

Loyd was vice-president in charge of real estate at the Citizens Bank at Warrensburg, Missouri. He had prepared several oil and gas leases but to the best of his knowledge he had never prepared one which called for an annual delay rental. He had previously prepared paid-up leases. According to Loyd he advised Lundy he wanted a three-year lease on the 160 acres; that he was paying two dollars per acre for a three-year lease. After this telephone conversation, Loyd prepared a lease on a standard Kansas oil and gas lease Form 88—(Producers) B w. He filled in all blanks in the lease except the date the lease was entered into and the date the first annual delay rental was to be paid if no well was com-

menced. The lease provided it should "remain in full force for a term of Three years from this date and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."

The two dates were left blank because the lease had to be circulated for the signatures of twelve people and it was not known how soon this might be completed. Although Loyd had advised Lundy to fill in the dates after the lease had been signed, he did not do so. Lundy mailed the signed lease, with the dates left blank, to Loyd. On receipt of the lease Loyd dated it February 18, 1975, and in the blank for the due date of the first annual delay rental he inserted February 18, 1978. The seeds of this lawsuit were thus sown. Apparently the lease was recorded in Ness County but Lundy never received a copy of the lease in final form. No drilling activity was begun by Loyd.

Then Sidwell became interested in obtaining an oil lease on this same land and learned of the former lease in favor of Loyd. Sidwell suggested to Lundy that Loyd's lease be released of record or an affidavit of nonproduction and nonpayment of rentals be executed and recorded. The depository bank reported that no delay rental had been paid on or before February 18, 1976. Sidwell entered into oil and gas leases with the owners dated March 16, 1976. In August, 1977, Sidwell commenced drilling operations on the land. Production casing was set and cemented. Then Sidwell was advised by Lundy that Loyd was claiming a three-year lease, paid up to February 18, 1978. Sidwell ceased operations immediately. Loyd went into possession and completed the well as a producer. The parties stipulated at trial that Sidwell's costs amounted to $78,167.84 and that Loyd's costs came to $9,872.42.

Sidwell commenced this litigation in September, 1977, and has since regained possession of the premises pending the outcome. The well is located in wildcat territory. The case was tried and the court found the Loyd lease was void on the ground there was no meeting of the minds as to material provisions of the lease.

In order for parties to form a binding contract, there must be a meeting of the minds as to all essential terms. *Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.,* 212 Kan. 730, 734, 512 P.2d 379 (1973). As between the original parties to a contract parol evidence to show mutual mistake may be introduced in an action to show the nonexistence of a binding contract. The rule

that parol evidence is inadmissible to contradict or vary a written contract presupposes an action involving a valid existing obligation. *Branstetter v. Cox*, 209 Kan. 332, 335, 496 P.2d 1345 (1972). Parol evidence is admissible to show a mutual mistake which prevented the consummation of a contract that purports to be evidenced by a written instrument.

At the trial Lundy testified as to his conversation with Loyd over the telephone as follows:

"Q. Now, you say when he contacted you he asked you about the lease. Can you give us to the best of your recollection the negotiations that went on during that conversation, if you can recall, and what the terms of the agreement were?

"A. I told him that the land was not leased for oil and it could be leased. And, we discussed the terms and very plainly I told him that I would lease it for three years, two dollars per acre the first year and one dollar delay rental for each year that a well was not started thereon.

"Q. Now, are you familiar with oil and gas leases?

"A. I think so.

"Q. Do you know what the term, 'bonus' means?

"A. What?

"Q. Do you know what, 'bonus' means?

"A. Yes.

"Q. Can you tell us what that means?

"A. That is the first payment that is made when you sign the lease.

.  .  .  .

"A. —the terms were a three year lease with a bonus of two dollars per acre for covering the first year and one dollar per acre thereafter each year unless a test was made to see if there was any oil there."

Loyd on the other hand testified as to this same conversation as follows:

"Q. Now, would you tell the Court the substance of your conversation with Mr. Lundy concerning the terms of the lease, the payment of the consideration for the lease, and what, if anything was said concerning delay rentals and those conversations? Just tell us as well as you can what you said and what Mr. Lundy said?

"A. Like I said, he said they would only want to probably lease it for three years, and that they would want two dollars an acre and—two dollars an acre and he mentioned something about delay rentals. And, I said, 'Now, it is three years for two dollars an acre on 160 acres, that is $320.00.' And then Mr. Lundy says, 'Yes.' Then he mentioned a delay rental, and I stressed again, 'But, it is two dollars an acre for a three year lease just as—' I didn't say to him, but it was in my mind to say, 'like I have always written leases in Chautauqua County.' And, he said, 'That's right, three dollars an acre.'

"Q. Three dollars?

"A. Two dollars an acre for three years. Then he told me that he got a quarter an acre for expenses, or what-have-you, for handling this for the Miner heirs.

"Q. Now, this is important, what if anything was said in that conversation relative to the date that the delay rental would be paid, if it was to be paid?

"A. Well, he stressed on the phone that I was buying a three year lease on 160 acres for two dollars an acre. The two dollar an acre delay rental was to come after the three years. I was giving $320.00 for a three year lease."

On cross-examination of Loyd he admitted that he was not familiar with the terms used in oil and gas leases in western Kansas where this lease was. He testified as to his understanding of the terms of the lease he had taken.

"Q. Are you telling this Court that under the lease as you understand that, you could perpetuate that lease as long as you wanted by simply tendering a delay rent?

"A. If there was no objection from the landowners.

"Q. Without getting a new lease you could keep on perpetuating it by simply paying the delay rental?

"A. Yes.

. . . .

"Q. I'm going to hand you a copy of your deposition taken in Mr. Dalton's office on November 16, 1977. It says—beginning at line 3 on page 33, 'Let me give you a hypothetical lease, and I want you to explain it to me to the best of your knowledge: I have some land and you want to lease it, and I tell you I'll give it to you for three dollars bonus and one dollar delay rental. You explain to me what I just said in laymen's terms. If we took that lease today, I said a three year lease, Tuesday, November 22, 1977, three dollars bonus, one dollar delay rental, when is the first delay rental due?' Do you recall what your answer was?

"A. Yes, it is three years if that is like our agreement with Mr. Lundy.

"Q. What was your answer then?

"A. 'A. In 1980, if it is for three years.'

"Q. What would be your testimony today if I said I would give you a three year lease starting from today with three dollars bonus and one dollar delay rental? Is your interpretation of that, that your delay rental would be due three years from today's date?

"A. No.

"Q. Can you explain why that was your interpretation in November of 1977 and why that is not your interpretation now?

. . . .

"A. Well, I have learned that in western Kansas the delay rental, that is the agreement that you have with the man that you are dealing with, if you pay in the bonus then you are supposed to pay a rental a year after that or another year after that. Then, that would make my answer different now.

. . . .

"Q. You are telling this Court that absent any implied obligation you had to drill, that you have a perpetuating oil and gas lease by paying a delay rental every year and keep it going without getting a new lease, is that right?

"A. Yes."

The form of the lease used by Loyd in the present case was the Kansas (Producers) Form 88 B w. This form is a standard printed

form commonly used in the oil and gas industry for Kansas leases. It contains the provision for a "cash in hand" payment, normally referred to as the bonus, to be paid to the lessors for executing the lease. In *State, ex rel., v. Board of Regents,* 176 Kan. 179, 269 P.2d 425 (1954), the word "bonus" used in oil and gas leasing is defined:

"The term 'cash bonus' has in the oil business a well-settled meaning. It is money paid by the lessee to the lessor in consideration of the execution of an oil and gas lease, as distinguished from royalty which under the form 88 lease, as we have here, is the one-eighth of all oil and gas produced to be paid lessor. (See *Geller v. Smith,* 130 Cal. App. 485, 20 P.2d 102.) It is usually paid by the lessee to the lessor as consideration for a lease in territory more or less desirable as a drilling project." 176 Kan. at 190.

Delay rental provisions are ordinarily part of a "drilling clause" that specifies a time, usually much shorter than the so-called "primary term" of the lease, in which a well is to be commenced. If a well is not commenced within the time specified in the "unless" clause delay rentals must be paid to hold the lease during the primary term. Under what has been described as the general rule, an "unless" clause of the standard oil and gas lease is intended to keep it in force only within the primary term. 38 Am. Jur. 2d, Oil and Gas § 124, p. 591. See also Annot., Oil and Gas Lease - Delay Money, 67 A.L.R. 221, 224.

In the present case the lessee as scrivener chose a printed form of lease commonly used for leases where a "bonus" payment is to be paid to secure execution of the lease and where an "unless" clause is included under which it is customary to provide for an annual delay rental payment due before the end of the first year after execution of the lease and each year thereafter unless a well is commenced.

The parties both agree in the present case that the term of the lease, commonly referred to as the primary term of the lease, was to be three years and as long thereafter as oil or gas, or either of them, was produced from said land by the lessee. The misunderstanding arose, however, over the times of payment and amounts to be paid. This was further complicated by the particular form chosen to record the agreement in writing. Loyd wanted a three-year paid-up lease but chose the wrong form. Then, instead of crossing out the "unless" clause which covers provisions for payment of annual delay rentals he left the date of payment of the first annual delay rental blank until after the lease was signed up

and then he filled in a date three years hence. On the surface, at least, the annual delay rentals were deferred until the three-year paid-up lease was about to expire and the delay rentals if paid each year thereafter would presumably continue the lease indefinitely.

On the other hand, when Lundy explained to Loyd the terms of the lease which the owners were willing to execute, he talked of a "bonus" payment and annual delay rentals, as these terms are commonly used and understood in the oil and gas leasing business. When the lease form was submitted by Loyd it was not a standard paid-up lease form. The lease as submitted contained blanks for the date of the lease and the date of the "unless" clause. This was in line with what Lundy understood to be their agreement. When the lease was executed by the owners Lundy mailed it back to Loyd without filling in the dates as he had previously been authorized to do by Loyd. His failure to do so contributed to the confusion.

When the evidence pertaining to the existence of a contract is conflicting a question is presented for the trier of facts. The controlling question as to whether a binding contract was entered into depends on the intention of the parties and is a question of fact. *Hays v. Underwood, Administrator,* 196 Kan. 265, Syl. ¶ 1, 411 P.2d 717 (1966); *Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.,* 212 Kan. 730, Syl. ¶ 3. The mere fact a contract contains blanks when signed does not make it invalid. However, it is a voidable contract if the blanks are filled in as to material parts in an unauthorized manner. *Ray v. Brush,* 112 Kan. 110, 210 Pac. 660 (1922); *First National Bank, Bismarck v. O'Callaghan,* 143 N.W.2d 104 (N.D. 1966).

The above rule is clearly illustrated in the comment following Restatement of Contracts § 442(3) (1932), where this example is given:

*"Illustration:*

"1. A lends B $5000, and B gives A a note or a sealed or an unsealed writing, reciting the loan and stating a promise by B to A 'to repay' in six months without interest. The writing does not state the amount to be repaid. A fills an appropriate blank left in the writing before the word 'dollars' with the words 'five thousand.' The writing is operative as a written contract to pay that sum if B authorized the insertion specifically, and, also, unless there are circumstances showing a contrary intention, if he gave no such authorization. A fraudulent insertion of the words 'Six thousand' would discharge B."

Here there was no evidence of any fraudulent intention on the part of either party. The trial judge found:

"2. Mr. Lundy says he advised Loyd that a delay rental would be required. Mr. Lundy's later conduct in contacting the depository bank and then writing the Miner heirs to secure a new lease is consistent with this interpretation. Mr. Loyd admits that delay rentals were discussed, but he did not understand that term and thought this was something that came later. He thought he had a three year lease for $2.00 per acre and his conduct in filling in the blank in the drilling clause, failing to pay the rental, and refusing to release the lease are consistent with this belief. The testimony of Mr. Lundy and of Mr. Loyd was clear and convincing and both persons were sincere and believable. The Court concludes that there never was a meeting of the minds with reference to the Loyd lease because Mr. Loyd did not understand the conversation with reference to delay rental and Mr. Lundy did not realize that there was a misunderstanding with this term. If there is no meeting of the minds, then there can be no contract. *Care Display, Inc. v. Didde-Glaser, Inc.,* 225 Kan. 232; *Starts v. Eby Construction Co.,* 217 Kan. 34; *Steele v. Harrison,* 220 Kan. 422."

We agree with the findings of the trial judge for we are convinced by the evidence that there was no meeting of the minds when this contract was entered into. Loyd thought he was purchasing a three-year paid-up lease but he erroneously used a form lease not suited to such a lease. Lundy, on the other hand, thought the lease was to be the type of lease commonly used in western Kansas, a three-year lease with a bonus payment of $320.00 and requiring annual delay rentals of one dollar per acre beginning one year from the date of the lease. This understanding was furthered by the form of the lease tendered by Loyd in which the material date of the "unless" clause was left blank.

In *Steele v. Harrison,* 220 Kan. 422, 552 P.2d 957 (1976), this court said:

"To constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract. (See 17 Am. Jur. 2d, Contracts, §§ 18, 19, pp. 354, 355; 17 C.J.S., Contracts, § 31, p. 635.)" 220 Kan. at 428.

In *Topeka Savings Association v. Beck,* 199 Kan. 272, 428 P.2d 779 (1967), certain unauthorized language was inserted in a deed after it had been executed and delivered. In holding there was no meeting of the minds of the parties the court said:

"In order for parties to form a binding contract, there must be a meeting of the minds as to all the essential terms thereof." Syl. ¶ 2.

In our present case either a provision for a three-year paid-up

lease or a provision for a bonus payment with an annual delay rental beginning one year after the lease becomes effective would be essential terms of a lease agreement. The present case appears to be one in which each party misunderstood the expressions of the other. An offer of Loyd was made in terms that Lundy misunderstood; and Lundy accepted in terms that Loyd understood as an assent to the offer that Loyd meant to make. Each party was mistaken as to the meaning of the other. It is clear that no contract should be held to exist in such case. This is illustrated by the classic English case of the ship "Peerless" which appears in the Restatement of Contracts § 71 (1932). A buyer and a seller made what appeared to be an agreement for purchase and sale of a stated amount of cotton to arrive by the ship "Peerless" from Bombay. It happened there were two ships then at Bombay, both named the "Peerless." The buyer knew of only one of these ships, and he believed that there was a breach of contract by the seller when no cotton arrived by that ship. The seller knew only of the other ship, the one on which he shipped the cotton, and he asserted a breach by the buyer when the buyer refused to receive and pay for the cotton when it arrived. The English court held that no contract existed and that the plaintiff had no right to damages. This result, based on no meeting of the minds, is recited with approval in 3 Corbin on Contracts § 599 (1960).

Defendant Loyd contends that plaintiff's action was barred by the statute of limitations. K.S.A. 60-513($a$)(3), (4). This question was previously raised on a motion for summary judgment, appealed to the Court of Appeals and decided by that court in an unpublished opinion. The decision of the Court of Appeals holding the statute did not apply became the law of this case. We refuse to reopen that which has been decided. *State v. Hutchison,* 228 Kan. 279, 285-86, 615 P.2d 138 (1980).

Defendant Loyd next contends the theory on which the trial court decided the case was not covered in the pretrial order. We disagree. When the pretrial order was prepared Judge Aldrich was presiding. The order set out the factual contentions of each party, plaintiff claiming the negotiations culminated in a three-year lease with a $2.00 per acre bonus and an annual delay rental of $1.00 per acre in the event oil was not produced during the first year, and defendant claiming a paid-up lease for three years with no delay rental due until the end of the three years.

When Judge Aldrich disqualified himself, Judge Flood took over and tried the case. At the conclusion of the evidence defendant objected to any discussion of the theory of no meeting of the minds. Judge Flood pointed out that the evidence on this theory was introduced and it was tried on that theory. Therefore, the objection was overruled and properly so.

"Where the record shows the parties have submitted their entire case for decision on all issues, without objection, they are held to have consented that the court decide such issues even though outside the scope of the pretrial order." *Addis v. Bernardin, Inc.,* 226 Kan. 241, Syl. ¶ 3, 597 P.2d 250 (1979).

Defendant questions the quantum and quality of the proof to establish there was no meeting of the minds. We have examined the testimony. A contract or lease may only be set aside on clear and convincing evidence. *Regier v. Amerada Petroleum Corp.,* 139 Kan. 177, 181, 30 P.2d 136 (1934). The quantum and quality of the proof in this case was clear and convincing as found by the trial court. We agree with its assessment of the evidence in this case. See K.S.A. 60-252(*a*) and *City of Council Grove v. Ossmann,* 219 Kan. 120, Syl. ¶ 2, 546 P.2d 1399 (1976).

Defendant maintains that the trial court erred in permitting the testimony of E. R. Sidwell as to custom and practice in the oil industry with regard to payment of annual delay rentals in the area of Ness County. This man testified he had been in the oil business since 1955, he had carried on leasing operations, supervised the preparation of leases during this period and had prepared thousands of such leases. He was associated with several oil businesses and managed Sidwell Oil & Gas, Inc. Twenty-five years in the oil business should be sufficient to qualify him to testify as to custom and usage of that business with regard to terminology and meaning of words used in written leases. See 3 Corbin on Contracts § 579 at 426.

Several other peripheral issues have been raised by defendant and considered by this court. What has been said sufficiently disposes of the questions raised. The findings of the trial court were supported by the evidence. The findings adequately supported the trial court's conclusions.

Judgment affirmed.

HERD, J.: I respectfully dissent. The majority affirmed a judgment holding there was no meeting of the minds between

lessors and lessees to an oil and gas lease nullifying the lease. The evidence does not support that decision.

Let us review the facts. It is uncontroverted that the Miner heirs executed an oil and gas lease to Loyd. It properly described the land, the term of the lease, the consideration, the usual covenants, the parties and the beginning date. Those are the essential, material elements of an oil and gas lease. The only objection to this lease pertains to the drilling clause. Loyd mistakenly inserted the termination date of the primary term (1978) rather than the anniversary date (1976) of the lease in the blank reserved for drill, pay or forfeit. That date has no effect on the first year of the lease. Loyd could have drilled the first year and perfected the lease; obviously the parties' minds met on the lease and the trial court's judgment is erroneous.

Loyd's action in inserting the wrong date unintentionally eliminated delay rentals from the lease. Loyd had agreed to pay delay rentals but he did not know how to draft a lease. He did not know delay rentals are annual obligations in lieu of drilling. He did not know an oil lease cannot be extended beyond its primary term by payment of delay rentals. *Baldwin v. Oil Co.,* 106 Kan. 848, 189 Pac. 920 (1920). Loyd's inexperience caused the mistake. There is no fraud or misrepresentation involved. The mistake could not nullify the lease and should not effect a forfeiture. This court should do equity and reform the lease to conform to a standard oil and gas lease, as the parties intended, with the lessee permitted to pay delay rentals out of time. He had relied, in good faith, on the terms of the lease as written. The lessors were not injured thereby and could have ascertained the defect had they checked the public record since the lease was recorded. All of the elements justifying equitable relief are present. 3 Corbin on Contracts § 614 (1960), addresses this issue as follows:

"Reformation of a written instrument will be decreed when the words that it contains do not correctly express the meaning that the parties agreed upon, as the court finds to be convincingly proved. The writing may omit a provision that they agreed should be put in; or it may contain a provision that they agreed to leave out or that was not in fact assented to. A very common mistake is the insertion of an incorrect description of the subject matter; street numbers, survey numbers, boundary lines, area, may be erroneous by reason of a typist's error, bad memory, copying from an earlier document that was itself erroneous." pages 713-17.

Referring to unilateral mistake:

"Reformation may be a proper remedy even though the mistake is not mutual. If

one of the parties mistakenly believes that the writing is a correct integration of that to which he had expressed his assent and the other party knows that it is not, reformation may be decreed." p. 730.

And mistakes of law:

"[I]t is believed that the time has come to say that the exceptions now make the rule, that social policy requires that mistake of law and mistake of fact be treated alike, and that in granting relief for mistake the attention of the court should be directed to the other factors in the case." p. 752.

See also 66 Am. Jur. 2d, Reformation of Instruments § 19, p. 544; *Federal Land Bank v. Bailey,* 156 Kan. 464, 134 P.2d 409 (1943).

The majority decision is unjust and sets a bad precedent. It will invite cancellation of instruments for any irregularity, particularly in the area of insurance. I would reverse.

SCHROEDER, C.J., joins the foregoing dissenting opinion.