56 F.3d 1233
 James A. BERRY, Michael Carter, Consolacion D. Didonna,
Richard L. Dold, Eugene Gold, Lloyd Rex Hendrix, Linda
Howell, Bernard Hurt, Robert King, William G. Leavitt,
Richard L. McCauley, Harold Scott, George Simpson, Terry
Sulzberger, Ronald W. Walsh and Robert Worthley, Plaintiffs-Appellants,
v.
GENERAL MOTORS CORPORATION, Defendant-Appellee.
 No. 94-3000.
 United States Court of Appeals,
Tenth Circuit.
 May 26, 1995.
Rehearing Denied June 28, 1995.
 
 Dennis E. Egan (Mark A. Buchanan, with him on the briefs), of The Popham Law Firm, P.C., Kansas City, MO, for plaintiffs-appellants.
 Rosalee M. McNamara (John J. Yates, with her on the brief), of Gage & Tucker, Kansas City, MO, for defendant-appellee.
 Before SEYMOUR, Chief Judge, SETH, Circuit Judge, and KANE, District Judge*.
 SETH, Circuit Judge.
 
 
 1
 The Appellants filed this suit against General Motors as salaried non-union employees after they were not selected for positions at a new plant. The Appellants were experienced employees of GM and had held responsible supervisory positions for an extended time. They assert that seniority should have controlled the selection, and that seniority rights were derived from an implied contract of employment. They further assert that the implied contract was created by a pamphlet given by the company to new salaried employees. This was titled Working With General Motors (hereinafter "Working"). This contained details in somewhat general terms as to the individual's relationship with the company in the job of a salaried employee.
 
 
 2
 The trial court found no evidence of an intent to create a contract, and that there was no implied contract.
 
 
 3
 The seniority issue arose at the Kansas City, Kansas Fairfax I plant where, as mentioned, GM was selecting salaried employees to staff the Fairfax II plant to be constructed and Fairfax I closed. The new plant was to be operated under entirely different production methods and theory to make a new product. There would be strong employee team work, cooperation on the job, and great emphasis on quality.
 
 
 4
 The department heads at Fairfax I were to select salaried employees for Fairfax II who would best carry out the new methods and the cooperative approach. The department heads in this selection were not to be bound by seniority. No salaried employees were to be laid off or terminated by the Fairfax change, and none were.
 
 
 5
 At about the same time as the Fairfax change General Motors began (in 1986) a company-wide 25% reduction in its salaried employees. This contemplated that the company-wide reduction would be accomplished by several incentive programs. These included an Early Retirement Program and a Separation Incentive Program (a buy-out) whereby employees could receive a cash payment and benefits if they elected to quit GM.
 
 
 6
 Those individuals, including the plaintiffs, not selected for Fairfax II were encouraged to consider the company-wide incentive programs. They also could remain on salaried status with temporary assignments, or if they had formerly been in the hourly work force they could return to it. Those not selected for Fairfax II thus had the above options. If no election was made by them before a certain date they remained as salaried employees on temporary assignment until a permanent one was available. As mentioned, no individuals in the salaried category, as were the plaintiffs, were laid off by reason of Fairfax II.
 
 
 7
 There were a series of general meetings of the employees of Fairfax I at which the local management described the changes to be made. There were individual interviews had by some of the plaintiffs. The company hired a consulting firm and the salaried employees were told there were opportunities to discuss the alternatives with company individuals trained by the consulting firm. These included the options mentioned above. The individuals not selected for Fairfax II were notified and they were put on administrative leave with pay to make a decision and attend workshops and meetings.
 
 
 8
 The trial court found that there was no evidence that the parties intended to form a contract. It thus held that there was no implied contract of employment and denied plaintiffs' claims.
 
 
 9
 The implied contract of employment sought to be established would have, in their view, required that seniority would control the selection for Fairfax II. The pamphlet relied on, "Working With General Motors," was prepared at and by the company headquarters to be given to employees. It was unilaterally changed from time to time at Detroit with no local input or discussion. There was no authority to change or add to it by the local management. There were no negotiations with the salaried employees as to "Working." When "Working" was received by a salaried employee it was not signed for or signed nor otherwise acknowledged.
 
 
 10
 Portions of "Working With General Motors" follow (Exhibit 182):" 'Working with GM' describes personnel policies and procedures that guide relationships as we work together in General Motors....
 
 
 11
 ...
 
 
 12
 "Regular Employe
 
 
 13
 "As a regular employe, your employment is on a calendar month-to-month basis.... [page 4]
 
 
 14
 "If layoffs become unavoidable, reductions in the work force are made separately by each department and job classification.... Reductions will be made generally in the order of least total Corporate length of service for employes with five or more years of length of service and with a performance rating of Good Competent or higher. [page 26]
 
 
 15
 "This booklet has been written in a general way, to cover what are considered to be the most important highlights of GM's salaried personnel policies....
 
 
 16
 "To better meet the needs of GM people and GM, policies have been modified from time to time. GM believes this should occur only when absolutely necessary, and that when it does occur, you should receive a prompt and full explanation of the changes and the reasons behind them....
 
 
 17
 "While the policies and procedures in the booklet do not constitute a legal contract, and do not modify the month-to-month employment relationship (which in fact may not be altered, amended or extended by any employe, representative or agent of GM) described on page 4, GM does believe they represent a good basis for a productive relationship between you and GM. For this reason, we are committed to their full implementation in every GM unit and to their sound administration." [page 32]
 
 
 18
 As mentioned, the salaried employees initially signed the "Employment Agreement" which stated that the employment was on a month-to-month basis only, and also recited that there were no other arrangements as to the employment. The employees signed "Compensation Statements" from time to time. These referred to the "Employment Agreement," and recited that "[t]here are no other arrangements, agreements, understandings or statements, verbal or in writing" that could affect the terms of employment other than the initial Employment Agreement and the Compensation Statements. (See Aple. App. Vol. I at 1-2, and Vol. II Tr. at 2130-32.)
 
 Working With General Motors
 
 19
 As mentioned, this appeal centers on the pamphlet "Working With General Motors" together with a consideration of all circumstances and factors relevant to the issue whether an implied contract was thereby created. In our view, and apparently in the view of the trial court, the following several factors relating to the pamphlet ("Working") are of significance.
 
 
 20
 1. "Working" was unilaterally created, and changed from time to time, by "Detroit" with input by local management.
 
 
 21
 2. There were no negotiations or discussions as to the contents or changes of "Working" with the salaried employees.
 
 
 22
 3. Its receipt by the employees was not acknowledged in any manner.
 
 
 23
 4. It was read by the plaintiffs with only one or two exceptions, and those who acknowledged they had read it understood the provisions here important.
 
 
 24
 5. The month-to-month "employment relationship" referred to in "Working" was stated in the "Employment Agreement" as above described.
 
 
 25
 6. The "Compensation Statements" referred to in the "Employment Agreement," as mentioned, recited that "there are no other arrangements, agreements, understandings or statements, verbal or in writing" as to the terms of employment other than in the "Employment Agreement" and "Compensation Statements."
 
 
 26
 7. The "Employment Agreement" did not refer to "Working," but stated that there were no other "arrangements" as to employment. Also the "Compensation Statements" recited that there were no other "arrangements," etc. other than those in the "Employment Agreement" and the "Compensation Statements," but again, did not mention and really excluded "Working."8. We have quoted the portions of "Working" containing the express disclaimer that it did not "constitute a legal contract." And further the provisions that "Working" could not be amended or extended by any employee, representative or agent of GM.
 
 
 27
 9. "Working" contains several phrases and words which demonstrate that it was not binding on anybody.
 
 
 28
 10. The provisions of "Working" have been considered, but further attention should be made to the disclaimer in this context. The disclaimer in "Working" is clear and direct. It is not inconsistent with the "Employment Agreement" and the "Compensation Statements." It was read before the suit by the Appellants except perhaps Walsh and Scott. Those too, if they did not read it before, cannot argue it was an implied contract as to their employment.
 
 The Case Law
 
 29
 The Supreme Court of Kansas in Morriss v. Coleman Co., 241 Kan. 501, 738 P.2d 841, at 848-849, stated the prevailing factors to be considered (derived for the most part from Allegri v. Providence-St. Margaret Health Center, 9 Kan.App.2d 659, 684 P.2d 1031, when it is asserted that an employment is based on an implied contract. These factors are to be used to determine the intent of the parties. These include:
 
 
 30
 1. written or oral negotiations;
 
 
 31
 2. conduct of the parties from the outset;
 
 
 32
 3. "usages of the business";
 
 
 33
 4. the situation and objectives of the parties "giving rise to the relationship";
 
 
 34
 5. the nature of the employment;
 
 
 35
 6. other circumstances surrounding the relationship which would explain the intent of the parties.
 
 
 36
 The above "factors" are all pertinent to the intentions to form a binding contract--whether there was a "meeting of the minds." Sidwell Oil & Gas Co. v. Loyd, 230 Kan. 77, 630 P.2d 1107. There is no "meeting" created by unilateral expectations of an employee. Conyers v. Safelite Glass Corp., 825 F.Supp. 974 (D.Kan.). Bargaining is an essential prerequisite. Conaway v. Smith, 853 F.2d 789 (10th Cir.). Past practice is not enough. Application of the required factors dictates that there was no intention to create a contract. Further there is no basis for a conclusion that past company practices, policy statements, nor statements at group meetings with the employees referred to above, or elsewhere, could create an implied contract in these circumstances, nor could the periodic job evaluations. Johnson v. National Beef Packing Co., 220 Kan. 52, 551 P.2d 779.
 
 
 37
 A large part of the record contains statements as to policy announcements, practice methods, previous changes by the company and employment practices. Generally these include the local managers up to the chairman of the company. But again these are not supportive of Appellants' position where the individuals, the context, and time is considered.
 
 
 38
 The documents including "Working" and the Employment Agreement expressly provide limits as to how the employment relationship can be changed. The context of the verbal statements and individuals' notes are necessarily within the Employment Agreement, the periodic Compensation Statements and "Working" which expressly stated the conditions of employment and the limitation on changes and are from persons with no authority to change the pertinent documents.
 
 
 39
 We must conclude that "Working With General Motors," the "Employment Agreement" and the "Compensation Statement" must be held to control the employment conditions of the salaried plaintiffs to permit the company to make the selections of persons to go to Fairfax II the way it did. There was no implied contract of employment. There was no intent to create one based on "Working." See Appendix for the facts as to individual plaintiffs.
 
 
 40
 There was no error in the trial court's disposition of the discrimination claim of James A. Berry, nor of the retaliation claims of plaintiffs Howell or Hurt nor the age discrimination claims of plaintiffs Gold, Hurt and Howell.
 
 
 41
 The plaintiffs strongly assert that the trial court erroneously refused to admit into evidence Exhibit 181. This was a letter or notice by the chairman of the company written to salaried employees generally about four years after the events which gave rise to this case. There was no connection shown with "Working" and it was not otherwise connected with the events. There was no abuse of discretion in refusing to admit the letter. Denison v. Swaco Geolograph Co., 941 F.2d 1416 (10th Cir.).
 
 
 42
 We have considered the other points raised by the plaintiffs and conclude they are without merit.
 
 
 43
 The judgment of the trial court is AFFIRMED.
 
 Appendix
 Plaintiffs
 James Berry (a body shop supervisor)
 
 44
 He signed the Employment Agreement and "Compensation Statements." He had read "Working" and knew its disclaimer that it was not a contract and did not change the month-to-month employment. James Berry signed a voluntary return to the hourly employee category.
 
 Michael Carter (a body shop supervisor)
 
 45
 He had read "Working" including the disclaimer. He had signed several "Compensation Statements" which referred to the monthly status in his Employment Agreement. He understood that GM could assign salaried employees to different positions without regard to length of service.
 
 Richard Dold
 
 46
 He had held several positions with GM. He had read "Working," knew of the disclaimer and no contract consequence. He signed an Employment Agreement and signed periodically a Compensation Statement which incorporated the Employment Agreement.
 
 Eugene Gold
 
 47
 He had been assigned to several departments from time to time. He read "Working" including the disclaimer and the month-to-month employment provision. He signed Compensation Statements referring to the Employment Agreement's monthly employment. He was given two weeks with pay to consider the options. He decided to return to an hourly basis.
 
 Lloyd Hendrix
 
 48
 He acknowledged he would not have gone to Fairfax II as a paint department supervisor if seniority had been used. He also had signed an Employment Agreement and Compensation Statements.
 
 
 49
 Ronald Walsh (a paint department supervisor)
 
 
 50
 He had signed an Employment Agreement with the month-to-month employment and Compensation Statements. He acknowledged he would not have gone to Fairfax II if seniority had applied. He had not read "Working" and had seen no papers which would limit all GM job assignments to a seniority standard.
 
 Robert King (body shop supervisor)
 
 51
 He had signed an Employment Agreement which he understood provided GM could assign him as the need arose. He signed employment statements which referenced his month-to-month employment. He had read "Working" including the month-to-month employment and that it was not a contract.
 
 
 52
 George Simpson (supervisor in trim department)
 
 
 53
 He had read "Working." He signed an Employment Agreement with the month-to-month employment and Compensation Statements. He did not have seniority to be selected.
 
 
 54
 Harold Scott (a material control scheduler)
 
 
 55
 He had been assigned to several different departments based on the needs of GM. He had not read "Working" when questioned at his deposition. He knew of layoffs which were not based on seniority. He would not have been assigned to Fairfax II in Scheduling as there was no position there of material scheduler.
 
 
 56
 Barnard Hurt (associate reliability engineer in quality reliability department)
 
 
 57
 He had some eight moves before the time in question within GM. He had read "Working" with the no contract disclaimer and the month-to-month employment. He knew the functions of his department at Fairfax I would be very different in Fairfax II. Hurt filed an age discrimination claim with the EEOC, but this was not known to the director of quality reliability when he made the decision that Hurt would not go to Fairfax II.
 
 
 58
 Linda Howell (benefit clerk in personnel) (age 41)
 
 
 59
 She had read "Working" including the disclaimer. The job she held was eliminated with the company-wide centralization, but there were personnel clerk positions. She was not selected. She asserted that younger persons were assigned to Fairfax II personnel. The company witness testified that of the two clerks over forty years of age one was selected and one was not. She was reassigned to security and complains of vacation denial, the hours of the shifts she worked on, and she asserts retaliation by her shift assignments in security.
 
 Richard McCauley (material scheduler)
 
 60
 He would not have been assigned to Fairfax II if seniority was used. He had the shortest length of service in his department.
 
 
 
 *
 The Honorable John L. Kane, Jr., United States District Judge for the District of Colorado, sitting by designation