Sara Pauline **WHITE**, Plaintiff,

v.

**MIDWEST OFFICE TECHNOLOGY, INC., and its representatives, Metro–Plex Information Systems, a Division of Midwest Office Technology Inc., and its representatives; David Egly in his representative capacity and in his individual capacity; and Kenneth Illig in his representative capacity and in his individual capacity, Defendants.**

Civil Action No. 96–4116–DES.

United States District Court,
D. Kansas.

April 28, 1998.

Michael B. Myers, Myers & Myers, Topeka, KS, for Plaintiff.

Julia Riggle McKee, C. Brooks Wood, Cheryl Bloethe Linder, Hillix, Brewer, Hoffhaus, Whittaker & Wright, L.L.C., Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This employment discrimination action comes before the court on defendants' Motion for Summary Judgment (Doc. 34). Plaintiff has filed a Memorandum in Opposition to defendants' Motion (Doc. 39). Defendants have filed a Reply (Doc. 53). This case arises out of following claims: (1) sexual harassment and retaliation in violation of the Kansas Act Against Discrimination, Kan. Stat.Ann. § 44–1009 ("KAAD"), and Title VII of the Civil rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"); (2) employment discrimination on the basis of sex in violation of the KAAD and Title VII; (3) retaliation for filing discrimination complaints in violation of the KAAD and Title VII; (4) state common-law tort of outrage; (5) state common-law tort of retaliation for filing a workers' compensation claim; and (6) breach of implied employment contract. The

court has considered the briefs of counsel, the uncontroverted facts and applicable law, and is now prepared to rule.

## I. FACTS

The following facts are either uncontroverted or, if controverted, construed in a light most favorable to plaintiff as the non-moving party. Immaterial facts and factual averments not properly supported by the record are omitted.

Plaintiff Sarah Pauline White began working at Metro–Plex Information Systems ("Metro–Plex") in Lenexa, Kansas, on or about September 14, 1987. Metro–Plex is in the business of selling and servicing copy machines and is wholly owned by Kenneth Illig ("Illig") Ms. White had a close working relationship with Mr. Illig while he actively managed Metro–Plex.

Mr. Illig actively managed Metro–Plex until David Egly ("Egly") took over as General Manager in November 1993. Mr. Illig hired Mr. Egly to "grow" the company, primarily by expanding sales. Business began to boom after Mr. Egly became general manager.

Soon after Mr. Egly became general manager, Ms. White's employment responsibilities increased. The working environment also began to deteriorate, in Ms. White's view, as a result of Mr. Egly's offensive conduct. Ms. White kept contemporaneous notes of any work-related event which she considered to be significant. She resigned her employment with Metro–Plex on December 18, 1995, effective December 29, 1995.

These and other relevant material facts are set forth in more detail throughout the court's discussion.

## II. SUMMARY JUDGMENT STANDARD

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1985). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material act is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *id.* "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Laboratory*, 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. 2548.

Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (interpreting Fed. R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. 2548. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. 2548.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tend-

ing to show triable issues in the light most favorable to the existence of those issues"). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the non-movant for a finder of fact to return a verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. 2505.

## III. DISCUSSION[1]

### A. Application of Statutory Time Limit

■ 42 U.S.C. § 2000e–5(e) provides that a discrimination charge must be filed within 300 days after the alleged unlawful conduct occurs. This filing is a prerequisite to a civil suit under Title VII. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Defendants contend that many of plaintiff's allegations are time-barred because they occurred more than 300 days before plaintiff filed her EEOC and KAAD charges on June 21, 1995. Plaintiff concedes that many of the alleged acts of harassment occurred outside the time limit imposed by Title VII. She also alleges, however, many incidents which clearly occurred within the 300 day time frame. Plaintiff contends that these incidents, when viewed together with those incidents that occurred outside the time limitation, represent a continuing pattern of discrimination.

■ The Tenth Circuit recognized the continuing course of conduct doctrine in the context of a gender discrimination claim in *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 984 (10th Cir.1991). That doctrine provides that a discrimination claim may include challenges to conduct which occurred outside the applicable limitations period of Title VII if the various acts constitute a "continuing pattern of discrimination." *Furr v. AT & T*

*Technologies, Inc.*, 824 F.2d 1537, 1543 (10th Cir.1987). This requires that there "be at least one instance of the discriminatory practice within the filing period for the doctrine to apply, and the earlier acts must be part of a continuing policy or practice that includes the act or acts within the statutory period." *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1415 (10th Cir.1993) (quoting *Furr*, 824 F.2d at 1543). "It is not sufficient merely that acts outside the required time limit had a continuing effect within the statutory time allowed for suit." *Martin*, 3 F.3d at 1415.

■ For determining whether specific and related discriminatory acts amount to a discriminatory practice, the Tenth Circuit has adopted the approach taken by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir.1983). *Martin*, 3 F.3d at 1415. That approach requires the court to consider several nonexclusive factors relevant to the continuing violation question. The first factor is subject matter. Do the alleged violations constitute the same type of discrimination? The second factor is frequency. Were the alleged violations isolated and infrequent or recurring? The third factor is permanence. Was the nature of the alleged violations such that it should trigger an employee's awareness of the need to assert her rights and would the consequences of the act continue in the absence of a continuing intent to discriminate? *Id.*

■ Here, plaintiff claims that David Egly repeatedly, throughout her employment with Metro–Plex, made sexually explicit remarks and gestures in her presence, which she objected to and reported to Kenneth Illig. Assuming for purposes of the statute of limitations issue only, that Egly's conduct constitutes sexual harassment, plaintiff's allegations would suffice to establish a

---

1. The court notes at the outset that plaintiff's Response brief contains numerous factual arguments that are not properly supported by reference to the record. Without a specific reference, the court is under no obligation to "search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1025 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992); *accord, United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Nonetheless, out of an abundance of caution, the court has reviewed the record when necessary in an effort to resolve any questions in favor of plaintiff as the nonmoving party.

continuing pattern of discrimination by Egly and awareness of that harassment by Illig to render that harassment chargeable to Metro–Plex. Defendants argue that plaintiff admitted she considered filing a charge in August 1994, and that if her work environment was, in fact, hostile or abusive, she was fully aware of that fact before September of 1994. Since plaintiff claims she recognized the discriminatory nature of her work environment before September 1994, defendants contend, she should not be able to rely on continuing violation doctrine which "is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." *Martin*, 3 F.3d at 1415, n. 6 (citing *Alldread v. City of Grenada*, 988 F.2d 1425, 1432 (5th Cir.1993)).

■ The court agrees that if a defendant's conduct should have . alerted a reasonable person to act to assert her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory time limitation. *See Martin*, 3 F.3d at 1415. The court is constrained, however, by the *Martin* court's decision, wherein the Tenth Circuit found that the plaintiff provided sufficient evidence to demonstrate a genuine issue of material fact concerning the existence of a continuing violation notwithstanding that the plaintiff allowed sexual harassment, including an incident of rape, to continue for a long time before she filed a complaint with the EEOC. In light of *Martin*, the court finds that plaintiff has shown enough to avoid summary judgment on the statute of limitations issue and therefore the court will consider evidence of incidents that occurred prior to the 300–day statutory time limitation. The court must now determine whether all the incidents alleged, including those within and outside of the limitations period, are sufficient to establish a case of sexual harassment under the hostile work environment theory. *See Martin*, 3 F.3d at 1416 (citing *Estate of Pitre v. Western Elec. Co.*, 975 F.2d 700, 705 (10th Cir.1992); *Allen*, 928 F.2d at 984; *Furr*, 824 F.2d at 1543).

## B. Sexual Harassment—Hostile Work Environment

Title VII prohibits sexual harassment in the workplace. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Sexual harassment under Title VII may be shown under either of two principal theories: quid pro quo discrimination or hostile work environment. *Id.* at 65–66, 106 S.Ct. 2399. Plaintiff has made no quid pro quo claim that sexual favors were coerced in exchange for employment benefits. *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir.1987). Rather, she charges that discrimination based on sex created a hostile or abusive work environment.

■ A hostile work environment exists when a plaintiff is subjected to sexual harassment "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399 (citation omitted). Sexual harassment is behavior " 'that would not occur but for the sex of the employee'.... 'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination.'" *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1537 (10th Cir.1995) (citations omitted).

In *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court stated:

Conduct that is not severe or pervasive enough to create an objectively hostile environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

This court, therefore, must determine whether a reasonable jury, considering the admissible evidence as presented by plaintiff in opposition to defendants' motion for summary judgment, could find that the alleged conduct was: 1) gender based or stemmed from sexual animus; and 2) pervasive or severe enough to objectively alter the terms, conditions or

privilege of employment. *Gross,* 53 F.3d at 1539 (citations omitted). This determination must be made "in light of 'the record as a whole' and 'the totality of [the] circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Id.* at 1537 (quoting *Meritor,* 477 U.S. at 69, 106 S.Ct. 2399).

■ In opposition to defendants' summary judgment motion, plaintiff presents evidence of conduct which she contends establishes the existence of a hostile work environment. The court will first determine whether there is sufficient evidence for a finder of fact to conclude that any of the conduct complained of resulted from gender bias or sexual animus. If so, the court will then determine whether there is sufficient evidence for a finder of fact to conclude that the conduct was severe or pervasive enough to objectively alter the terms, conditions or privilege of plaintiff's employment at Metro–Plex.

Plaintiff opposes defendants' summary judgment motion by offering evidence of David Egly's offensive comments and outbursts. Plaintiff states that at an administrative hearing Egly ordered employees to stop quoting prices and giving customer information to sales people without Egly's permission or they would be penalized by wage reduction. Plaintiff believes this threat was directed at her because she was the only employee who provided such information to the sales department. Plaintiff does not, however, offer any evidence that Egly's conduct resulted from gender bias or sexual animus. Such conduct, even if misguided, may demonstrate poor management skills, but does not, without more, evidence gender bias. Absent evidence to the contrary, poor management decisions cannot be characterized as gender-based. *See Ballou v. University of Kansas Medical Ctr.,* 871 F.Supp. 1384 (D.Kan.1994).

Plaintiff also offers evidence that Egly raised his voice and called salesman Mike Miller a "fucking bastard." Plaintiff believes this outburst was in response to a customer complaint that she had delivered to Egly. While such antics may contribute to an unpleasant or even offensive work environment, plaintiff offers no evidence suggesting a connection between her gender and Egly's offensive outburst. There is no reason to believe, therefore, that this hostility derived from some gender-based animosity or bias. Furthermore, Egly's outburst was clearly directed at Mr. Miller, and appears from the record to be little more than an angry, albeit offensive, loss of professional bearing over what Egly perceived as a deficiency in the company's customer service department.

Plaintiff presents evidence that, while in her presence, Egly made a reference to Kenneth Illig's "skinny little ass," suggested that a male employee had to make his sales calls even though he was wearing his "fruit of the loom underwear," and frequently used profanity. Plaintiff contends this conduct is evidence of a hostile work environment. The court disagrees. In *Gross,* the Tenth Circuit held that telling a co-worker to "get [her] ass back in the truck" did not demonstrate gender discrimination because "ass" refers to a portion of human anatomy shared by both sexes. Egly's use of that term is thus not evidence of gender discrimination. Moreover, Egly's use of that term was far more innocuous than that of the *Gross* defendant as it was neither directed at plaintiff nor at any other female employee.

Egly's comment to a male employee about his underwear was likewise neither directed at plaintiff nor at any other female employee, and plaintiff provides no explanation as to how it stemmed form gender bias or sexual animus. Egly's use of profanity in this case is also unhelpful to plaintiff's argument. In addition to the absence of particulars, there is no evidence that profanity was directed at any particular person other than Mr. Miller, or that any gender-based vulgarity was used to characterize, describe, or reference any female employee. To the contrary, the evidence suggests that Egly had a habit of using coarse language whether his audience consisted of male or female employees or both. Egly's conduct may have been crude and offensive, but plaintiff presents no evidence to support a finding that it resulted from gender bias or sexual animus.

Plaintiff also presents evidence that, while she was present, Egly commented to Maggie

Jolitz that a particular hairdresser they were discussing "only cuts pubic hair," that Egly directed an employee via telephone to "grab them by the balls and get a signed contract," that in response to a male employee's announcement that he lost weight Egly asked "How did you find the little thing?" and that Egly inquired of a male employee standing with his hands in his pockets whether he was "playing with pee-wee." Plaintiff presents no evidence, however, that Egly made these comments because of her gender. None of these statements was directed at plaintiff, and except for the hairdresser comment, they were all directed to male employees. While Egly's conduct in these particular situations may have been less than professional, the presence of unprofessional or even vulgar conduct, standing alone, does not establish that it resulted from gender bias or sexual animus.

Plaintiff next complains about an incident that occurred on November 10, 1994, while she and Egly were discussing her return from her carpel tunnel surgery. According to plaintiff, Egly responded to her concern that she could not properly fix her hair and makeup by saying "Let lover boy [plaintiff's husband] do your hair and come on in and I'll do your makeup." Similarly, plaintiff complains about Egly's comment on November 30, 1994, that "[her husband] did a great job on her makeup" and "that it was the best it ever looked." Plaintiff states that this latter comment caused her to feel "degraded and humiliated." Once again, Egly's conduct may have been impolite and possibly even offensive, but plaintiff presents no evidence to support a finding that it resulted from gender bias or sexual animus. That only women generally wear makeup is not enough to convert this merely offensive behavior into conduct motivated by sexual animus or gender bias.

Plaintiff further complains about Egly's use of offensive nicknames for certain employees in the office including "stallion," "filly," "girly," "missy," "scruffy," "nanny-goat," "order-taking monkey," and "sales-slut." Significantly, plaintiff states that Egly never referred to her using any nickname. She also states that terms like "girly," "missy" and "nanny-goat" were used by Egly to refer to both men and women. Plaintiff asserts that she was offended by Egly's use of those terms when addressing male employees because she believed that Egly was suggesting that the men so addressed were homosexuals. That many of these terms were used in a gender-neutral manner belies any inference that this conduct resulted from sexual animus or gender bias, and plaintiff's personal discomfort regarding the possibility that one or more of her co-workers was homosexual is beside the point and does not alter this conclusion. Nevertheless, the court believes a reasonable jury could find that Egly's use of the term "sales-slut" in reference to one of the female employees was gender-based or resulted from sexual animus.

Plaintiff contends that Egly once invited her to accompany a group of employees for drinks after work. Plaintiff declined the invitation and, while she was not offended by the invitation *per se*, she found Egly's attempts at persuading her to join the group offensive. According to plaintiff, Egly suggested that she could not do anything without first going home to her husband. Plaintiff felt that in so doing, Egly implied she was not a cooperative employee. She presents no evidence however, that this conduct resulted from gender bias or sexual animus. Even if Egly criticized her conduct, without some type of gender-specific reference, it cannot be construed as gender-based conduct. *See Gross*, 53 F.3d at 1545–46.

As further evidence of gender discrimination plaintiff states that "every single time she went into Egly's office he "bombarded" her with explicit heterosexual and homosexual remarks and jokes." As an example, plaintiff refers to a particular colloquy between Egly and Miller, during which plaintiff understood Egly's pantomime to mean Miller "used the bathroom in a woman's fashion" and that Miller's ears protruded because they are used as "handles during oral sex." Discerning whether such conduct is merely vulgar and offensive or sexually harassing can be especially difficult where the conduct is tinged with offensive sexual connotations. Nevertheless, to survive summary judgment, there must be sufficient evidence from which

the trier of fact can conclude that such conduct resulted from gender bias or sexual animus.

In its recent landmark decision recognizing same-sex sexual harassment claims under Title VII, the Supreme Court clarified its position that "Title VII does not prohibit all verbal or physical harassment in the workplace;" it is directed only at "discriminat[ion] ... because of ... sex." *Oncale v. Sundowner Offshore Services, Inc.,* —— U.S. ——, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998). The Court emphasized that it has never held "that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* Instead, the critical issue for a Title VII claim "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citing *Harris,* 510 U.S. at 25, 114 S.Ct. 367.) The court noted that "whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.'" *Id.*

Here, plaintiff presents little or no evidence that Egly's jokes and remarks resulted from gender bias or sexual animus thus constituting "discrimina[tion] ... because of ... sex." Indeed, the evidence indicates that Egly's comments were nearly always directed at male employees, particulary Mr. Miller. Although sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII, that many of the comments in this case were directed at male employees supports the conclusion that they did not result from gender bias. Moreover, while evidence of specific details of all allegedly harassing conduct is generally not necessary to survive summary judgment, plaintiff must at least provide some competent evidence "that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.'" *Oncale,*

—— U.S. at ——, 118 S.Ct. at 1002 (citing *Harris,* supra, 510 U.S. at 25, 114 S.Ct. 367).

Plaintiff offers the testimony of a male co-worker that "through Egly's mannerisms and comments about women in general, Egly treated women like second class citizens." This is perhaps the strongest evidence offered by plaintiff to show that Egly's jokes and comments resulted from gender bias. However, it is far too tenuous to raise a genuine issue for trial, particulary considering that this rather conclusory testimony was elicited through questions by plaintiff's counsel without the presence of counsel for the defendants. In a similar "statement," one of plaintiff's female co-workers testified that the Metro–Plex environment was "very stressful and high pressure, that women were always uncomfortable about what Egly was saying because it was .... usually of a sexual nature." Again, merely because many of Egly's comments had sexual connotations does not, without more, support the conclusion that they resulted from sexual animus or gender bias.

Finally, plaintiff submits evidence of three incidents overtly sexual in nature. The first incident occurred in November 1993. Plaintiff states that Egly took an electric back massager, which had been given to her as a gift from another employee, and placed it against his groin while "doing a little dance" and saying "Oh, oh." While the court is not fully convinced this behavior was anything more than gender-neutral buffoonery, for purposes of this summary judgment motion, this incident will be construed as being motivated by gender bias or sexual animus. The court notes, however, that in so construing this incident, it will also consider that at the time of the incident, Egly was neither the general manager nor plaintiff's supervisor.

The second incident occurred in November 1994. As plaintiff was leaving Egly's office, Egly held her arm and directed her attention to a male salesperson, to whom Egly then yelled "show your cheeks." In response, the fully clothed salesman bent over and grabbed his buttocks. Although defendant characterizes this incident as mere gender-neutral jesting, the court believes a reasonable jury

could find that it was gender-based or resulted from sexual animus.

The third incident occurred in April of 1995. After offering to share some carrots from a small bag he was carrying, Egly withdrew a carrot for himself and commented that the crooked carrot he was holding "would give some woman a thrill." Defendant states that this comment was made to himself, implying that there is no evidence to suggest that he made this comment because of plaintiff's gender because he was not aware she could overhear him. Plaintiff, however, contends that Egly's comment was actually directed at her because he knew or should have known he could easily be overheard because of the proximity of her desk. As to this comment, the court believes a reasonable jury could find that it was gender based or resulted from sexual animus. Furthermore, the court will assume, notwithstanding some evidence to the contrary, that plaintiff subjectively perceived each of these incidents as sexually motivated at the time they occurred.

The next question is whether Egly's conduct was pervasive or severe enough to objectively alter the terms, conditions or privilege of plaintiff's employment. *See Meritor*, 477 U.S. at 67, 106 S.Ct. 2399. The Supreme Court said this standard is the middle ground between one that makes merely offensive conduct actionable and a standard that requires a psychological injury. *Harris*, 510 U.S. at 22, 114 S.Ct. 367. A "mere utterance of an ... epithet which engenders offensive feelings in an employee," *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399, "does not impact a condition of employment and, therefore, does not implicate Title VII." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. On the other hand, Title VII becomes an issue before the employee suffers a nervous breakdown. *Id.* at 22, 114 S.Ct. 367. Circumstances to consider in each case include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* "[A] any relevant factor may be taken into account, [but] no single factor is required." *Id.*

at 23, 114 S.Ct. 367. Only that conduct which the court has found to be discriminatory, i.e., resulting from gender bias or sexual animus, will be considered at this stage of the inquiry. *See Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir.1994) ("General harassment if not racial or sexual is not actionable.").

"The *Meritor* test is a disjunctive one, requiring that the harassing conduct be sufficiently pervasive or sufficiently severe to alter the terms, conditions, or privileges of Plaintiff's employment." *Smith v. Norwest Financial Acceptance, Inc.*, 129 F.3d 1408 (10th Cir.1997). The court addresses the severity of the harassing conduct in this case first. "Plaintiff must demonstrate that the harassment is severe under both the subjective and objective requirements of *Harris*." *Smith*, 129 F.3d at 1413. The court finds, for purposes of the present matter only, that plaintiff has established she subjectively believed Egly's conduct was so severe that it created an abusive or hostile environment.

Next, plaintiff must establish that Egly's conduct was sufficiently severe or pervasive for a reasonable jury to find the work environment hostile or abusive. The record reflects that in this case plaintiff presents evidence of three incidents which were overtly sexual in nature, and references to a female employee as a "sales slut," all of which conduct is deemed for purposes of the present matter to have stemmed from gender bias or sexual animus. There is also evidence that Egly referred to Sylvia Land, plaintiff's female co-worker, as "the hot sex queen," and "sex goddess," in front other employees, but not plaintiff, and that on at least one occasion, Egly gave plaintiff a "suggestive look." The court is not convinced, however, that a reasonable jury, considering all of the circumstances of this case, could find Egly's conduct sufficiently severe to have created a hostile or abusive work environment. None of Egly's conduct was physically threatening and plaintiff does not allege any unwelcome sexual advances or inquiries into her personal sexual preferences or practices. Nor does plaintiff allege that Egly engaged in any sexually suggestive touching or groping with her or any other female employee. More-

over, none of the jokes or vulgar language was directed at plaintiff, nor was plaintiff characterized or referred to by use of any offensive language.

Those cases in which the Tenth Circuit has found conduct severe enough to have altered the conditions of employment involved behavior far more serious than the type of conduct involved here. For example, in *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996 (10th Cir. 1996), offensive conduct included a salesman pushing the plaintiff against a wall, placing his knee between her legs, and stating "if you ever, you f'ing bitch, talk to my clients again I'll fix you," and calling the plaintiff a "whore," "floor whore," "curb whore," "curb side cunt," and "bitch," on a consistent basis. In *Smith v. Norwest Financial Acceptance, Inc.*, 129 F.3d 1408 (10th Cir.1997), the offensive conduct included statements to the plaintiff by her supervisor to "get a little this weekend" so she would "come back in a better mood," that plaintiff "would be the worst piece of ass that [he] ever had," that the plaintiff "must be a sad piece of ass" who "can't keep a man." Likewise, the offensive conduct in *Hirase–Doi v. U.S. West Communications, Inc.*, 61 F.3d 777 (10th Cir.1995), included verbal and written sexually offensive remarks propositioning the plaintiff and attempts to touch her breast, grabbing her between her legs, and approaching and flirting with numerous other female employees. In contrast to the behavior of the defendants in those cases, Egly's behavior, though unprofessional and frequently offensive, falls far short of the same level of severity. The court finds that plaintiff has failed to establish a triable issue regarding whether defendant's conduct was sufficiently severe to alter the conditions of her employment and create an abusive work environment.

The next question is whether plaintiff has presented evidence that Egly's conduct was sufficiently pervasive for a reasonable fact-finder to conclude that it created an abusive or hostile work environment. The court finds that she has not. Although the record before the court contains numerous allegations of sexual harassment, most of them either are not supported by competent evidence or lack sufficient evidence to suggest the possibility that they resulted from gender bias or sexual animus. Once these allegations are sifted out, the record reveals approximately six examples of conduct that could possibly be construed as gender-based by a reasonable fact-finder. Spread over two years of employment, however, these incidents fall short of rising to the frequency necessary for a conclusion that the conduct was so pervasive as to change the terms and conditions of plaintiff's employment. Furthermore, even if plaintiff was successful in establishing that some of Egly's sexually tinged jokes and comments resulted from gender bias, this would not have necessarily created an issue for trial in light of plaintiff's testimony that her contact with Egly was "fairly limited."

The court concludes that, considering the totality of the circumstances in this case, a reasonable fact-finder could not find the sexual harassment either severe or pervasive enough to render the work environment at Metro–Plex hostile or abusive, While the court recognizes that plaintiff's working conditions may have been unpleasant or even to some degree offensive, this is not enough to support a cause of action for gender discrimination. Title VII is not a code of "civility" by which to remedy every unpleasant work environment, but is rather a remedy for those employees subjected to disadvantageous terms and conditions of employment as a result of their gender. *See Oncale*, 118 S.Ct. at 1002. In this case, plaintiff's evidence is insufficient to allow a jury to conclude that plaintiff or any other female employee at Metro–Plex was subjected to disadvantageous terms and conditions of employment to which male employees were not. Accordingly, summary judgment will be granted in defendants' favor with respect to plaintiff's hostile work environment claim.

### C. Plaintiff's Constructive Discharge Claim

 A plaintiff asserting a claim of constructive discharge must produce evidence that the " 'employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled

to resign.'" *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir.1990) (quoting *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986)). "'[P]roof of constructive discharge depends upon whether a reasonable [person] would view the working conditions as intolerable.'" *Id.* (quoting *Derr*, 796 F.2d at 344) (internal quotations omitted). Here, defendant contends that plaintiff's constructive discharge claim must fail because the facts do not show that her working environment was so intolerable as to compel a reasonable person in her position to resign. The court agrees. As noted above, plaintiff failed to present evidence from which a reasonable person could find the incidents of sexual harassment at Metro–Plex either severe or pervasive enough to render the work environment hostile or abusive.

Moreover, even if plaintiff had advanced evidence from which a jury could find a discriminatory work environment, the evidence strongly suggests that plaintiff left her employment for reasons unrelated to sexual harassment. Plaintiff's resignation letter, for example, includes no references to sexual harassment or gender discrimination as reasons for her resignation. Instead, she states in her letter that she resigned because she believed her work efforts were "not welcomed" and were "suppressed." Likewise, plaintiff's testimony regarding her diary is also inconsistent with her constructive discharge claim. In response to defense counsel's question why her diary, which covered the last six months of her employment at Metro–Plex, included no entries about profanity or sexually related comments, plaintiff stated that "things had calmed down a little bit at that time."

The evidence establishes that plaintiff's true reasons for resigning were unrelated to her complaints of sexual harassment. This conclusion is further supported by plaintiff's response brief, in which she stated that the reasons for her resignation "includes verbal confrontations, allegations of poor work performance and unreasonable requests regarding goal setting," none of which is related to sexual harassment. Accordingly, the court finds as a matter of law that plaintiff's constructive discharge claim must fail. *See, e.g.,*

*Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.1992) (no constructive discharge when plaintiff resigned for reasons unrelated to sexual harassment), *aff'd*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *see also Bolden v. PRC, Inc.*, 43 F.3d 545, 552 (10th Cir.1994), *cert. denied*, 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995) (no constructive discharge when plaintiff resigned for reasons unrelated to racial harassment).

**D. Plaintiff's Retaliatory Discharge Claim**

Plaintiff claims that defendants retaliated against her for engaging in protected activity under Title VII and the KAAD. Plaintiff filed administrative charges on June 21, 1995, while still employed at Metro–Plex. Plaintiff voluntarily resigned her employment effective December 29, 1995.

In order to establish a prima facie case of retaliatory discharge, a plaintiff must show: (1) she engaged in protected activity; (2) she subsequently suffered adverse action by the employer; and (3) there was a causal connection between the protected activity and the adverse action. *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208–09 (10th Cir.1997); *Archuleta v. Colorado Dep't of Institutions, Division of Youth Services*, 936 F.2d 483, 486 (10th Cir.1991). "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir.1982). Once a plaintiff succeeds in establishing a prima facie case of retaliation, the burden shifts to the employer to proffer legitimate, nondiscriminatory reasons for the adverse action. *Berry*, 74 F.3d at 986. If the employer sets forth legitimate nondiscriminatory reasons for the adverse action, the plaintiff must then establish that the defendant's reasons are merely a pretext for retaliation. *Id.* "The overall burden of persuasion remains on the plaintiff." *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir.1993).

Defendants argue that plaintiff fails to establish a prima facie case of retaliation because she provides no evidence of

adverse action. As the court noted in *Jeffries v. State of Kan., Dept. of Social and Rehabilitation Services*, "courts liberally define an adverse employment action." 946 F.Supp. 1556, 1567 (D.Kan.1996) (citing *Berry*, 74 F.3d at 986). " '[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well.' " *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir.1996) (quoting *Collins v. State of Ill.*, 830 F.2d 692, 703 (7th Cir.1987)). However, the *Jeffries* court noted, while adverse job actions cover more than measurable losses of salary or benefits, "not everything that makes an employee unhappy is an actionable adverse action." *Smart*, 89 F.3d at 441. To be actionable, the adverse employment action must be "material:"

> "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."

*Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir.1996) (quoting *Crady v. Liberty Nat'l Bank & Trust*, 993 F.2d 132, 136 (7th Cir. 1993)).

The *Jeffries* court set out several examples of adverse employment actions, including decisions that have a demonstrable adverse impact on future employment opportunities or performances; demotions, adverse or unjustified evaluations and reports; transfer or reassignment of duties; failure to promote; and unfavorable letters of reference to prospective employers. *Jeffries*, 946 F.Supp. at 1567 (citations omitted). These examples of adverse employment action are consistent with the general notion that " '[a]n adverse action is one that affects the terms, privileges, duration, or conditions of employment.' " *Yerdon v. Henry*, 91 F.3d 370, 378 (2nd Cir.1996) (quoting *Johnson v. Frank*, 828 F.Supp. 1143, 1153 (S.D.N.Y.1993)).

Defendants contend that plaintiff presents no evidence of any material adverse action following her filing of charges on June 21, 1995. Defendants' argument implies that the court may only consider evidence of adverse actions occurring on or after the date plaintiff filed charges. This is incorrect. Protected activity includes more than the filing of a formal complaint of discrimination. Informal complaints to management also qualify as protected activity. *Rettiger v. IBP, Inc.*, 980 F.Supp. 1182, 1190 (D.Kan. 1997) (citing *Huddleston v. Lumbermens Mut. Cas. Co.*, 942 F.Supp. 504, 511 (D.Kan. 1996)). Accordingly, the court will consider evidence of retaliation occurring subsequent to or contemporaneous with plaintiff's informal complaints to Egly or Illig concerning her objections to conduct which she perceived as discriminatory.

In her response brief, plaintiff claims she engaged in protected activity by "repeatedly asking Egly to refrain from sexually harassing her" and that she first informed him that his conduct offended her in November 1993. Plaintiff's argument makes no reference to the record, however, to support these allegations. Nor could the court find evidentiary support for these claims. Summary judgment is therefore appropriate since plaintiff fails to provide evidence that she engaged in protected activity for which she contends she was retaliated against. Even if the record contained evidence of plaintiff's complaints about Egly's conduct, her retaliation claim would nonetheless fail for reasons the court will next address.

As evidence of adverse employment action, plaintiff alleges that Egly ridiculed her in front of other employees and made "veiled threats to cut her pay." Ridicule, however, does not meet the definition of "adverse employment action" as defined above. Nor do Egly's threats to cut plaintiff's pay because there is no suggestion that the threats were ever carried out. Plaintiff also alleges that Egly demoted her and "stripped her of her managerial duties." While such conduct would constitute adverse employment action, plaintiff wholly fails to support this allegation with evidence from

the record. Indeed, in its attempt to verify the sufficiency of plaintiff's evidence, the court found evidence strongly suggesting that plaintiff never actually held a management position to begin with. Finally, plaintiff alleges that Egly forced her to perform "ever increasing job duties related to her own job as well as those of other employees" without adequate compensation. Plaintiff supports this claim with her own deposition testimony. The court is not fully persuaded, however, that in this case, such conduct rises to the level of adverse employment action. Nevertheless, since all doubts must be resolved in plaintiff's favor, the court will consider the evidence of plaintiff's "ever increasing job duties" as evidence of adverse employment action.

The next element for consideration is the causal connection between the protected activity and the adverse action. Here the issue is whether plaintiff has provided sufficient evidence of a causal link between her objections to Egly's conduct, including the filing of her discrimination charges, and plaintiff's "ever increasing job duties." In her response brief, plaintiff states that she "has raised disputed facts regarding the causal connection" but fails to identify those facts to which she refers. Although this failure alone is enough to justify summary judgment, the court also notes that its review of the record reveals insufficient evidence of a causal connection between plaintiff's protected activity and the gradual increase in her responsibilities to defeat summary judgment.

### E. Plaintiff's Equal Pay Claim

■ Plaintiff claims that she was subjected to disparate treatment by Metro–Plex in violation of Title VII and the KAAD. Specifically, plaintiff asserts that Metro–Plex discriminated against her by paying her a lower salary than her male counterparts. To establish a prima facie case of wage-based sex discrimination, "a female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1362 (10th Cir.1997) (quoting *Meeks v. Computer Associates International,* 15 F.3d

1013, 1019 (11th Cir.1994)). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a "legitimate, non-discriminatory reason for the pay disparity." *Id.* (Citations omitted). If the defendant proffers such an explanation, the plaintiff must then show that the defendant, "regardless of the proffered reasons, intentionally discriminated against her." *Id.*

■ Here, plaintiff compares her job with that of the salespeople, called "account executives" at Metro–Plex. Plaintiff's principal job was the renewal of maintenance contracts. This job required plaintiff to mail maintenance contracts to customers, and to follow up by telephone with those customers who did not return the contract or money. She also had several administrative responsibilities in the office, including meter reading and customer service. In contrast, the principal job of the account executives was to sell copying equipment. This job entailed the traditional functions of a salesperson, including contacting prospective customers and persuading them to purchase a certain product, in this case copying equipment. That the salespeople also sold maintenance contracts does not somehow make their principal function the same or similar to that of plaintiff's function.

Plaintiff claims in her statement of controverted facts that she "did sell equipment up until Egly stripped her of that responsibility and forced her to give all sales leads to him." This statement is not supported even by her own citation to her deposition testimony. Instead, her testimony suggests that she generated sales leads in response to customer complaints about the operation of previously purchased copying equipment. Before Egly became general manager, plaintiff would apparently turn over these sales leads to whichever salesperson she decided upon. The only change Egly made regarding this process, according to plaintiff's own testimony, was to require her to pass along the leads to him and for him to decide to which salesperson they would be directed. Plaintiff's claim that she sold equipment "until Egly stripped her of that responsibility" is at best a serious overstatement of her own testimony.

Plaintiff states that she considered herself a salesperson and part of the sales staff. Her feelings about her job title notwithstanding, plaintiff was not considered an account executive at Metro–Plex and did not have the same job responsibilities. Significantly, plaintiff concedes that she did not attend sales meetings, turn in referral reports, or post prospects on the prospect board. She also concedes that she was not a member of the group that Egly supervised when he was the sales manager, that is, the salespeople.

Plaintiff does not present evidence sufficient to show that the job she occupied was the same or similar to those with whom she compares her pay. Moreover, even assuming plaintiff was performing the same or similar work, she presents no evidence that the pay disparity resulted from gender discrimination. The undisputed facts show that the sale's force included at least one woman, and there is no evidence that she was treated differently for purposes of compensation.

The evidence shows a legitimate basis for the difference in pay, and none of the evidence presented by plaintiff reveals a desire on the part of Metro–Plex to intentionally pay her less because of her gender. Since there is no genuine issue of material fact regarding plaintiff's gender discrimination claim, summary judgment on that claim will be granted.

**F. Plaintiff's Intentional Infliction of Emotional Distress Claim**

Defendants seek summary judgment on plaintiff's intentional infliction of emotional distress claim. To establish a claim of intentional infliction of emotional distress, commonly referred to as the tort of outrage, a plaintiff must demonstrate four elements: (1) the conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe. *Moore v. State Bank of Burden,* 240 Kan. 382, 729 P.2d 1205, 1211 (1986) (citing *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, 662 P.2d 1214 (1983)). For plain-

tiff's claim to survive summary judgment, the court must, as a matter of law, first determine that reasonable fact finders might differ as to: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and (2) whether plaintiff's emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it. *Id.* (citing *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981)). Conduct is not extreme and outrageous unless it is regarded as being "beyond the bounds of decency and utterly intolerable in a civilized society." *Id.* The threshold requirements for outrage causes of action are "necessarily high to separate meritorious claims from those based on trivialities or hyperbole." *Rupp v. Purolator Courier Corp.,* 790 F.Supp. 1069, 1073 (D.Kan.1992) (citing *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1261–62 (D.Kan.1984)).

Intentional infliction of emotional distress "is not a favored cause of action under Kansas law." *Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 501 (D.Kan. 1994) (quoting *E.E.O.C. v. General Motors Corp.,* 713 F.Supp. 1394, 1396–97 (D.Kan. 1989)). "The Kansas courts have been reluctant to extend the outrage cause of action to discrimination claims, including claims of sexual harassment, arising in the employment setting." *Id.* (quoting *Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990)). The existence of a hostile work environment sufficient to support a Title VII claim does not necessarily require a finding of outrageous conduct. *See, e.g.,* 1997 WL 161942, *16 (D.Kan.); *Anspach v. Tomkins Indus., Inc.,* 817 F.Supp. 1499, 1507 (D.Kan.1993), *aff'd,* 51 F.3d 285, 1995 WL 133385 (10th Cir.1995).

The few cases in which courts have permitted outrage claims to survive summary judgment motions have involved repeated physical threats and racially or sexually abusive language. *See, e.g., Laughinghouse,* 754 F.Supp. at 836; *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982). In *Laughinghouse,* the plaintiff was the victim of sexual harassment and abuse from her supervisor described as "a concerted effort to terrorize her and to intentionally break her spirit." 754

F.Supp. at 843. Such harassment and abuse took the forms of screaming, cursing, sexual comments and unwanted touching, fits of rage which included tearing up files and throwing things, threats of termination and other tactics. *Id.* Evidence in that case indicated that the defendant mounted a concerted effort to terrorize the plaintiff and to treat her "like an animal." *Id.* Similarly, the defendant in *Gomez* subjected the plaintiff to vulgar, racist expressions and threats of violence resulting in potentially serious medical problems. 645 P.2d at 918.

Defendants contend that summary judgment is warranted for plaintiff's intentional infliction of emotional distress claim because, even viewing the facts in the light most favorable to plaintiff, the facts do not demonstrate conduct so extreme or outrageous as to permit recovery under the tort of outrage. The incidents upon which plaintiff bases her claim are those same incidents upon which she bases her discrimination claims, and which are fully discussed above. In determining whether defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery for the tort of outrage, however, the court is not limited to considering only that conduct resulting from gender bias or sexual animus. The court may instead consider all conduct which plaintiff alleges supports her claim.[2] Nevertheless, the court is not persuaded that a reasonable fact finder could find defendants' behavior so outrageous that it transcends the bounds of decency and is utterly intolerable in a civilized society.

Unlike the defendants' conduct in *Laughinghouse* or *Gomez*, Egly's conduct did not include threats of physical violence. Plaintiff's assertion to the contrary is somewhat disingenuous, and is not supported by the evidence. Plaintiff cites her own testimony to support her assertion that Egly threatened her with violence, but examination of this testimony reveals that she was in fear of bodily harm from Egly because she had "seen him lose his temper a couple of time." This is not the type of behavior the courts have considered "threats of violence." More-

over, as defendants point out, plaintiff's own contemporaneous notes completely contradict her assertion that she was threatened with violence.

Another key distinction from *Laughinghouse* or *Gomez* is that Egly's conduct did not include unwelcome sexual advances or sexual epithets directed at or about plaintiff. Plaintiff's argument that Egly somehow established the workplace as "his world" in which he could abuse and exploit female employees is unavailing and is wholly unsupported by the evidence.

Since the first threshold requirement to plaintiff's claim for intentional infliction of emotional distress has not been satisfied, the court need not consider the second threshold requirement; that is, whether the plaintiff's distress was sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it. *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981). Nevertheless, the court has reviewed the evidence on this point and notes that the evidence is insufficient to establish plaintiff's mental distress as so extreme and severe as to support a claim for intentional infliction of emotional distress. Even after charitably crediting plaintiff's testimony, which is somewhat inconsistent, that Egly's conduct caused her to cry and seek her husband's support, it is not sufficient for a reasonable jury to find that her mental distress was so severe and extreme as to result in defendants' liability for intentional infliction of emotional distress. *See, e.g., Anspach v. Sheet Metal Workers' Intern. Ass'n Local No. 2,* 51 F.3d 285 (10th Cir.1995) (plaintiff's case of "nerves" and resulting hives did not establish emotional distress severe and extreme enough for liability).

Defendants' conduct may not reasonably be regarded as so extreme and outrageous as to be considered "beyond the bounds of decency and utterly intolerable in a civilized society." Nor was plaintiff's mental distress so severe and extreme as to result in liability. Accordingly, the court grants summary judgment in favor of defendants on plaintiff's

---

2. The court disagrees with plaintiff's argument that the court should consider Egly's misconduct

towards her co-workers of which plaintiff had no knowledge.

intentional infliction of emotional distress claim.

### G. Plaintiff's Negligent Infliction of Emotional Distress Claim

█ Defendants argue that plaintiff's claim for negligent infliction of emotional distress must be dismissed because plaintiff fails sufficiently to evidence physical injury. The court agrees. Under Kansas law, there can be no recovery for emotional distress caused by another's negligence unless accompanied by or resulting in physical injury. *See, e.g., Schweitzer–Reschke v. Avnet, Inc.,* 874 F.Supp. 1187, 1196 (D.Kan.1995); *Humes v. Clinton,* 246 Kan. 590, 792 P.2d 1032, 1038 (1990). In this case, since plaintiff presents no evidence that defendants' conduct was accompanied by or resulted in physical injury, her claim for negligent infliction of emotional distress must fail as a matter of law.

### H. Plaintiff's Workers' Compensation Retaliation Claim

Plaintiff received workers' compensation benefits for carpal tunnel syndrome which she claims to have developed as a result of her employment at Metro–Plex. Among the workers' compensation benefits plaintiff received were two surgeries, two leaves of absence, and a full return to her job. Plaintiff maintains, however, that in violation of Kansas common law, defendants retaliated against her for pursuing her workers' compensation rights.

█ The federal district courts in Kansas have consistently and uniformly applied the burden-shifting approach from *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in examining retaliatory discharge suits. *See Chaparro v. IBP, Inc.,* 104 F.3d 367, 1996 WL 733771, at *5 n. 3 (10th Cir.1996) (discussing with approval the treatment of retaliatory discharge claims among federal district courts in Kansas), *cert. denied,* —— U.S. ——, 118 S.Ct. 53, 139 L.Ed.2d 18 (1997). Under this approach, the burden is initially on the plaintiff to establish a prim facie case claim. To establish a prima facie claim of retaliatory discharge under Kansas law, a plaintiff must demonstrate that: (1) she filed a claim for workers' compensation benefits; (2) her employer had knowledge of her claim; (3) her employer discharged her; and (4) a causal connection exists between her protected activity or injury and her discharge. *Huffman v. Ace Elec. Co.,* 883 F.Supp. 1469, 1475 (D.Kan.1995).

█ Defendants contend that plaintiff's claim must fail because defendants never terminated her employment. Plaintiff responds that, although defendants never officially discharged her, Egly subjected her to onerous work conditions that amounted to a constructive discharge. Specifically, plaintiff alleges that "Egly immediately and continuously throughout [her] attempts to recover from bilateral carpal tunnel surgery, forced her to do extra work duties with the effect of forcing [her] to resign." She also claims that "Egly systematically ignored her request for accommodation of her disability." The court need not determine whether Egly subjected plaintiff to onerous work conditions, however, since the court does not believe that the Kansas Supreme Court would recognize a constructive discharge as sufficient to state an actionable retaliatory discharge claim. *See Diepenbrock v. Board of Educ.,* 1994 WL 613421, at *8 (D.Kan.1994) (finding plaintiff could not properly plead a cause of action for "constructive wrongful discharge" under Kansas law). *See also Marinhagen v. Boster, Inc.,* 17 Kan.App.2d 532, 840 P.2d 534 (1992) (grant of summary judgment improper because trier of fact must first determine whether employee quit or was fired). Plaintiff presents no authority to the contrary. Accordingly, summary judgment for defendants will be granted with respect to plaintiff's common-law retaliatory discharge claim.

### I. Plaintiff's Breach of Employment Contract Claim

█ Under Kansas law, it is well-settled that absent an implied or express contract between an employee and her employer covering the duration of employment, the employment relationship is terminable at the will of either party for good cause or no cause at all. *Panis v. Mission Hills Bank. N.A.,* 60 F.3d 1486, 1492 (10th Cir.1995), *cert.*

*denied,* 516 U.S. 1160, 116 S.Ct. 1045, 134 L.Ed.2d 192 (1996); *Johnston v. Farmers Alliance Mutual Ins. Co.,* 218 Kan. 543, 545 P.2d 312 (1976). In this case, plaintiff alleges a breach of an implied employment contract. Plaintiff contends that Kenneth Illig "guaranteed" her employment "until her retirement" and that she performed a wide range of duties for Metro–Plex "in exchange" for this promise. The result of this "exchange," plaintiff claims, was an implied contract for permanent or lifetime employment. Plaintiff further claims that Illig breached this alleged oral employment contract by allowing Egly to constructively discharge her.

▮ The existence of an implied employment contract depends on the intent of the parties, as determined by the totality of the circumstances. *Anglemyer v. Hamilton County Hospital,* 58 F.3d 533, 537 (10th Cir. 1995). The factors to be considered in determining the existence of an implied contract include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced. *Morriss v. Coleman Co.,* 241 Kan. 501, 738 P.2d 841 (1987).

▮ The formation of an implied contract in Kansas requires a proverbial "meeting of the minds" to which bargaining is an essential prerequisite. *Berry v. General Motors Corp.,* 56 F.3d 1233, 1237 (10th Cir.1995) (citing *Sidwell Oil & Gas Co. v. Loyd,* 230 Kan. 77, 630 P.2d 1107 (1981)). A unilateral expectation on the part of the employee does not create an implied-in-fact contract for continued employment. *Panis,* 60 F.3d at 1492.

▮ Whether an implied-in-fact contract exists is a question of fact. *Panis,* 60 F.3d at 1492. Under Kansas law, summary judgment is rarely appropriate in implied employment contract cases because of the necessity of determining both parties' subjective intent to form a contract. *Anglemyer,*

58 F.3d at 537. In this case, plaintiff has presented evidence of an implied employment contract. Specifically, plaintiff alleges that Kenneth Illig "guaranteed" her employment "until her retirement" and that she performed a wide range of duties for Metro–Plex "in exchange" for this promise. This evidence is sufficient to create a genuine issue of material fact under the Tenth Circuit's holding in *Anglemyer.*

Plaintiff's claim fails nonetheless, because she cannot establish that breach of such a contract occurred. Plaintiff alleges that Illig breached the employment contract "by allowing David Egly to proceed with an outrageous and calculated array of sexual harassment and retaliation." The court, however, has already addressed and rejected this constructive discharge argument. Summary judgment on plaintiff's breach of employment contract claim will therefore be granted for defendants.

**J. Plaintiff's Alter–Ego Liability Claim**

▮ Under the limited liability doctrine, a corporate entity is liable for the acts of its owners and operators only under extraordinary circumstances. *See Frank v. U.S. West, Inc.,* 3 F.3d 1357, (10th Cir.1993); *Cascade Energy and Metals Corp. v. Banks,* 896 F.2d 1557, 1576 (10th Cir.1990). In *Frank,* the Tenth Circuit recognized four tests that may be applied in deciding whether to disregard the corporate form and "pierce the corporate veil." *Id.* One of these tests, based on the "alter ego" theory, "is founded in equity and permits the court to pierce the corporate veil 'when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability from a crime.'" *Id.* (quoting *Zubik v. Zubik,* 384 F.2d 267, 272 (3d Cir. 1967)).

> [T]he federal common law doctrine of piercing the corporate veil under an alter ego theory can best be described by the following two-part test: (1) was there such a unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and

the individual are indistinct, and (2) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations?

*N.L.R.B. v. Greater Kansas City Roofing,* 2 F.3d 1047, 1052 (10th Cir.1993).

The first part of the alter-ego test measures the extent to which the corporation and shareholder have maintained separate identities. In deciding whether the personalities and assets of a corporation and shareholders have been blurred, the court must consider the degree to which corporate legal formalities have been maintained and the degree to which individual and corporate assets have been commingled. *Id.* In this case, plaintiff's evidence is wholly insufficient to raise a serious question about the separate corporate identity of defendant Metro–Plex. Contrary to plaintiff's allegations, the evidence reveals a properly capitalized, substantial business enterprise with operations in several metropolitan areas.

The second part of the alter-ego test measures whether adherence to the corporate form would result in fraud, promote injustice, or lead to an evasion of legal obligations. The showing of inequity necessary to satisfy this part of the test must result from misuse of the corporate form. "The mere fact that a corporation commits an unfair labor practice, or breaches a contract, or commits a tort, does not mean that the individual shareholders of the corporation should personally be liable." *Id.* Indeed, "the corporate form of doing business is typically selected precisely so that the individual shareholders will not be liable." *Id.* As with the first part of the test, plaintiff's evidence is insufficient, and falls far short of establishing that Egly or Illig used the corporate status of Metro–Plex to perpetrate fraud, evade existing obligations, or circumvent the law.

After careful review of the record before it, the court finds that plaintiff provides insufficient evidence to submit the issue of disregarding Metro–Plex's corporate form to a jury. Defendants' motion will be granted as to this claim.

**IT IS THEREFORE BY THE COURT ORDERED** that defendants' Motion for Summary Judgment (Doc. 104) is granted.